Cathelina **ANTOLOK**, et al., Appellants

v.

**UNITED STATES of America.**

No. 87–5324.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 10, 1988.

Decided April 28, 1989.

Abram Chayes, Cambridge, Mass., with whom E. Cooper Brown, Takoma Park, Md., Kathleen M. Tucker, and Fred Baron, Washington, D.C., were on the brief, for appellants.

Gregory C. Sisk, Atty., Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Robert S. Greenspan, Atty., Dept. of Justice, Washington, D.C., and Howard L. Hills, Atty., Dept. of State, were on the brief, for appellee.

Before WALD, Chief Judge, and STARR and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Opinion filed by Chief Judge WALD, concurring in judgment only.

Circuit Judge SENTELLE announced the judgment of the Court in an opinion as to which Circuit Judge STARR concurs in all except Part IIB. Chief Judge WALD filed a separate opinion concurring in the result.

SENTELLE, Circuit Judge:

Residents and former residents of the northern atolls of the Marshall Islands appeal from a District Court judgment dismissing tort claims arising out of nuclear testing conducted by the United States on those islands. The District Court dismissed these tort claims for lack of justiciability, concluding that the complaint raised nonjusticiable political questions. Since we find that the District Court committed no error in its dismissal, we affirm for the reasons set out more fully below.

## I. BACKGROUND

### A. The United States and the Marshall Islands

The relationship between the United States and the Marshall Islands traces to the end of World War II, when the United States liberated the islands from Japan, which had administered them under a League of Nations mandate. From 1944 until July 18, 1947, the United States governed the islands under a temporary military occupation government. On July 18, 1947, the United Nations brought the Marshall Islands and other islands of Micronesia within the U.N. trusteeship system. The United States and the United Nations Security Council approved a trusteeship agreement designating the United States as "administering authority" over a trust territory comprised of the Marshall Islands, the Mariana Islands, and the Caroline Islands, all of which were commonly referred to as Micronesia. Trusteeship Agreement for the Former Japanese Mandated Islands, approved Apr. 2–Jul. 18, 1947, United Nations–United States, 61

Stat. 3301, T.I.A.S. No. 1665. As administering authority, the United States assumed full responsibility for governmental functions of Micronesia, including executive, legislative, and judicial powers, *see id.*, art. 3, and agreed to assist in the development of the Micronesian islanders toward self-government and independence. *See id.*, art. 6; *see also* United Nations Charter, art. 76(b). Under the Trusteeship Agreement, the United States retained the necessary control and authority over the Marshall Islands to continue nuclear testing begun during the period of military occupation pursuant to the Atomic Energy Act of 1946, Pub.L. No. 79–585, 60 Stat. 755 (1946), *as amended by* Atomic Energy Act of 1954, Pub.L. No. 83–703, 68 Stat. 919 (1954). Plaintiffs in the present litigation are residents and former residents of the northern Marshall Islands claiming injury to their persons or property by radioactive fallout from the nuclear tests.

During the twenty years following the commencement of the trusteeship arrangement, the Secretary of the Interior, by authority of the President and with the advice and consent of the Senate, appointed a High Commissioner to serve as senior administrator of the trust territory. *See* Department of Interior Secretarial Order No. 2876, 29 Fed.Reg. 1855 (1964), *superseded by* Secretarial Order No. 2918, 34 Fed.Reg. 157 (1969). The High Commissioner reviewed both domestic and foreign governmental affairs of the trust territories. In the 1960's, the United States initiated progress toward Micronesian self-government. In 1965 a congress of Micronesia came into being. Elected leaders from throughout the trust territory met to discuss concepts of independence and political unity.

After the Micronesian Congress had considered various options, all parties agreed that cultural and geographic factors dictated a division of the trust territory into four independent governmental units, the Federated States of Micronesia, the Republic of Palau, the Commonwealth of the Northern Mariana Islands, and the Republic of the Marshall Islands ("RMI" or "Marshall Islands"), the only government whose citi-

zens are plaintiffs in the present litigation.[1] The RMI ratified a new constitution by referendum of March 1, 1979, and initiated a parliamentary government on May 1 of the same year. By order of April 25, 1979, the Secretary of the Interior, on behalf of the United States, acknowledged the existence of the governments of the Federated States of Micronesia, the Republic of Palau, and the RMI.[2] Secretarial Order No. 3039, 44 Fed.Reg. 28,116 (1979). This order delegated to the new governments most functions of government pending the termination of the trusteeship agreement but, subject to limitations contained in the order, retained in the United States residual authority for trusteeship obligations, including oversight of budget functions and administrative power to "suspend" legislation, amounting to a veto in the High Commissioner, subject to an appeal to the Secretary. *Id.* at §§ 3–6, 44 Fed.Reg. 28,117–18.

### B. The Compact of Free Association

All governments contemplated the evolution of the new entities toward self-governance with a view to the entry of each new government into a Compact of Free Association with the United States. In the case of the RMI, the negotiations leading to the Compact proceeded over the course of the next five years. Much of the negotiation concerned the settlement of nuclear claims giving rise to the present litigation. On June 25, 1983, the two governments executed the final version of the Compact of Free Association, Oct. 1, 1982–Jun. 25, 1983, United States–Micronesia–Marshall Islands, 99 Stat. 1800, T.I.A.S. No. _____ ("Compact"), with an accompanying nuclear testing claims settlement, Agreement for the Implementation of Section 177 of the Compact of Free Association, Jun. 25, 1983, United States–Marshall Islands ("settlement agreement" or "Section 177 Agreement"), *reprinted in* Joint Appendix ("J.A.") 67, which we will discuss below.

The RMI approved the Compact including the settlement agreement in a U.N.-monitored plebiscite in September of 1983 by 58 percent vote of the Marshall Islanders.

The President submitted the Compact and settlement agreement to Congress on March 30, 1984. After the 98th Congress failed to complete ratification, the President resubmitted the agreements to the 99th Congress on February 20, 1985. The House of Representatives approved final modified versions on December 11, 1985, and the Senate on December 13, 1985. *See Juda v. United States,* 13 Cl.Ct. at 673.

On February 18, 1986, the Nitijela, the constitutionally established legislative body of the RMI, enacted the Compact of Free Association Resolution of 1986, Res. No. 62 N.D.–2 (1986), declaring "for purposes of ... Article V of the Constitution [of the RMI], the Nitijela hereby approves the Compact and its subsidiary agreements, as they relate to the Republic of the Marshall Islands...." *Id.* § 3.

Thereafter the United States presented the Compact to the Trusteeship Council of the United Nations. On May 29, the Council adopted Resolution 2183 recalling the Trusteeship Agreement and

> *Not* [*ing* ] that the peoples of the ... Marshall Islands [and the surrounding Micronesian states] ... have freely exercised their right to self-determination in plebiscites observed by the visiting missions of the Trusteeship Council and have chosen free association with the United States of America.... [and]

> ....

> *Consider* [*ing* ] that the Government of the United States, as the Administering Authority, ha[d] satisfactorily discharged its obligations under the terms of the Trusteeship Agreement and that it [was] appropriate for that Agreement to be terminated with effect [from the ef-

---

**1.** For a more complete history of the Congress of Micronesia, the options considered, and the other governments not involved in this litigation, see *Juda v. United States,* 13 Cl.Ct. 667, 670–73 (1987).

**2.** The Northern Mariana Islands had obtained commonwealth status in 1976.

fective date of full entry in the Compact].. . .

*Examination of the annual report of the Administering Authority for the year ended 30 September 1985: Trust Territory of the Pacific Islands.* T.C. Res. 2183, 53 U.N. TCOR (1617th mtg). The Resolution further declared the awareness of the Trusteeship Council that the process "of facilitating the progressive development of the peoples in Micronesia toward self-government or independence ... has been successfully completed." *Id.* On January 14, 1986, President Reagan signed into law the Compact of Free Association Act of 1985, Pub.L. No. 99–239, 99 Stat. 1770 (1986) (*reprinted as amended in* 48 U.S.C. § 1681 note at 624–54 (Supp. IV 1986)) ("Compact Act").

On November 3, 1986, the President declared the Compact of Free Association with the Republic of the Marshall Islands in full force and effect retroactive to October 21, 1986. Proclamation No. 5564, § 3(a), 3 C.F.R. 149 (1987), *reprinted in* 48 U.S.C. § 1681 note at 658 (Supp. IV 1986). The United States and the Republic of the Marshall Islands subsequently exchanged diplomatic notes of formal recognition and established diplomatic missions headed by representatives ranked with other ambassadors. *Juda,* 13 Cl.Ct. at 677.

### C. The Present Litigation and the Settlement Agreement

On August 22, 1983, while the Compact and settlement were in negotiation, approximately three thousand present and former residents of the northern Marshall Islands and atolls directly downwind from the nuclear test sites filed the present action in the District Court for the District of Columbia, seeking damages for personal inju-

ries and death resulting from their exposure to dangerous levels of radiation.[3] Plaintiffs claimed that the District Court had subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1346 (United States as defendant), claiming liability under the Federal Tort Claims Act, 28 U.S.C. § 2674.

The District Court stayed the action at the request of the United States pending the entry of the two governments into the Compact of Free Association. Then, on motion of the United States, the Court dismissed the action for lack of jurisdiction based on Section 103(g)(1) of the Compact Act and Articles X and XII of the Section 177 Agreement. Section 103(g)(1) expresses the intent of Congress that the provisions of the 177 Agreement constitute a full and final settlement of all claims described in the cited articles of the Agreement and that "any such claims be terminated and barred except insofar as provided for in the Section 177 Agreement." Pub.L. No. 99–239, § 103(g)(1), 99 Stat. 1782 (*reprinted in* 48 U.S.C. § 1681 note at 629 (Supp. IV 1986)).

The District Court held that the RMI's espousal and settlement of the claims were not reviewable by the courts of the United States and that the Court lacked "jurisdiction over plaintiffs' claims, pursuant to valid law and in conjunction with non-reviewable foreign relations decisions." *Antolok v. United States,* No. 85–2471, slip op. at 8 (D.D.C. Jun. 16, 1987). It is from this order of dismissal that plaintiffs now appeal.

### II. ANALYSIS

The United States urges that we should affirm the District Court's dismissal of

---

**3.** Micronesian Islanders filed similar or parallel claims in the Claims Court and in the Central District of California. The Federal Circuit in *People of Enewetak v. United States,* 864 F.2d 134 (Fed.Cir.1988), affirmed the dismissal of claims of Marshall Islanders in *Peter v. United States,* 13 Cl.Ct. 691 (1987), and *Nitol v. United States,* 13 Cl.Ct. 690 (1987), adopting the Claims Court's conclusion that United States courts lack subject matter jurisdiction. In *People of Bikini v. United States,* 859 F.2d 1482 (Fed.Cir.1988), the Federal Circuit dismissed with prejudice an appeal of claimants in *Juda v. United States,* 13

Cl.Ct. 667 (1987), following the enactment of special legislation appropriating funds for the people of Bikini. The Ninth Circuit is holding in abeyance *Antolok v. Brookhaven Nat'l Laboratories,* No. 88–5749 (9th Cir. ordered held in abeyance Oct. 19, 1988), pending outcome of the instant appeal. In the lower court proceeding in that case, the District Court dismissed plaintiffs' claims as raising a nonjusticiable political question. *Antolok v. Brookhaven Nat'l Laboratories,* Nos. CV 82–2364, CV 82–4978 (C.D.Cal. Jan. 6, 1988).

these claims on two distinct theories, both of which arise out of the terms of the Section 177 Agreement and the Compact Act incorporating that Agreement: first, that the Compact (incorporating the Agreement) and the Act of Congress endorsing the Compact withdrew jurisdiction over these claims in express terms; second, that the challenge to settlement terms negotiated as an integral part of diplomatic recognition of a foreign state raises non-reviewable political question. Upon analysis of the Compact, the incorporated 177 Agreement, and the relevant legislation in light of precedent and other applicable law, we find that the District Court was correct in dismissing these claims for lack of jurisdiction.

## A. The Withdrawal of Jurisdiction

In Section 177 of the Compact of Free Association the United States "accept[ed] the responsibility for compensation owing to citizens of the Marshall Islands ... for loss or damage to property and person ... resulting from the nuclear testing program which the Government of the United States conducted in the Northern Marshall Islands between June 30, 1946, and August 18, 1958." Compact, § 177(a), 99 Stat. 1812 (*reprinted in* 48 U.S.C. § 1681 note at 642 (Supp. IV 1986)), T.I.A.S. No. ____, at ____. This Section provided that the two governments, the United States and the Marshall Islands, would set forth in a separate agreement provisions for "just and adequate settlement" of those claims and that the "separate agreement shall come into effect simultaneously with" the Compact. *Id.* § 177(b). Section 177(c) provides for a one hundred fifty million dollar grant from the United States to the Marshall Islands for payment and distribution under the separate agreement in satisfaction of those claims. *Id.* § 177(c).

Article X of the resulting Section 177 Agreement headed "Espousal" provides that the Agreement constitutes full settlement of all the nuclear testing claims, including any then pending or later filed in any court or other judicial or administrative forum "including ... the courts of the United States and its political subdivisions." Section 177 Agreement, art. X, § 1. Article XII of the Agreement is entitled "United States Courts." That Article reads, in full, as follows:

> All claims described in Articles X and XI of this Agreement shall be terminated. No court of the United States shall have jurisdiction to entertain such claims, and any such claims pending in the courts of the United States shall be dismissed.

*Id.*, art. XII.[4] By its plain language, the Agreement contemplated a divestiture of jurisdiction of the District Court over this subject matter.

Congress recognized as much and indeed required the same in the Compact Act. Section 103(g) of that Act expressly states "the intention of the Congress of the United States that the provisions of section 177 ... and the [Section 177] Agreement ... constitute a full and final settlement of all claims described in Articles X and XI of the Section 177 Agreement, and that any such claims be terminated and barred except insofar as provided for in the Section 177 Agreement." Pub.L. No. 99–239, § 103(g)(1), 99 Stat. 1782 (*reprinted in* 48 U.S.C. § 1681 note at 629 (Supp. IV 1986)).

It would appear obvious from the plain language of the 177 Agreement and the statute that Congress intended the District Court, and in turn this Court, to have no jurisdiction over claims, such as the ones asserted here, encompassed within the settlement agreement. It is axiomatic in our federal jurisprudence that inferior courts, including the District Court and this Court, have only that jurisdiction afforded them by Congress. Article III, Section 1 of the Constitution established the judicial power in "one supreme Court, and in such inferior

---

**4.** Article XI is an indemnity provision pledging the government of the Marshall Islands to hold harmless the United States, its agents, employees, contractors, citizens, and nationals from all claims set forth in Article X and any later claims arising out of the same nuclear testing program. The Article further caps the total amount of indemnification at one hundred fifty million dollars.

Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. In 1850, a unanimous Supreme Court held that

[t]he Constitution has defined the limits of the judicial power of the United States, but has not prescribed how much of it shall be exercised by the [inferior] Court[s]; consequently, the statute which does prescribe the limits of their jurisdiction, cannot be in conflict with the Constitution, unless it confers powers not enumerated therein.

*Sheldon v. Sill,* 49 U.S. (8 How.) 441, 449, 12 L.Ed. 1147 (1850). The 1850 Court was already able to call upon fifty-one years of precedent for that doctrine. *See Turner v. Bank of North America,* 4 U.S. (4 Dall.) 8, 11, 1 L.Ed. 718 (1799); *McIntire v. Wood,* 11 U.S. (7 Cranch) 504, 506, 3 L.Ed. 420 (1813); *Kendall v. United States ex rel. Stokes,* 37 U.S. (12 Pet.) 524, 619, 9 L.Ed. 1181 (1838); *Cary v. Curtis,* 44 U.S. (3 How.) 236, 245, 11 L.Ed. 576 (1845). Otherwise put, every court other than the Supreme Court "created by the general government derives its jurisdiction wholly from the authority of Congress. That body may give, withhold or restrict such jurisdiction at its discretion, provided it be not extended beyond the boundaries fixed by the Constitution." *Kline v. Burke Constr. Co.,* 260 U.S. 226, 234, 43 S.Ct. 79, 82, 67 L.Ed. 226 (1922). *See also Christianson v. Colt Indus.,* — U.S. —, 108 S.Ct. 2166, 2178, 100 L.Ed.2d 811 (1988).

It is simply too late in the day to assert that Congress lacks the power to deprive the inferior federal courts of subject matter jurisdiction over the present claims. The language of the statute and the Agreement are simply too plain to deny that Congress expressed this very intent in the present case.

This power of Congress is particularly plain in the present case, since it involves a matter of sovereign immunity. It is another axiom of our jurisprudence that "the United States may not be sued without its consent." 14 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure, § 3654, at 186 (2d ed.1985), and authorities

collected at note 2. While plaintiffs are correct that the Federal Tort Claims Act, 28 U.S.C. § 1346(b), initially provided a waiver of immunity for this tort action, Congress withdrew their consent for this type of claim in ratifying the Compact and the Section 177 Agreement, providing that "all claims described in Articles X and XI of the Section 177 Agreement ... [are] terminated and barred except insofar as provided in the Section 177 Agreement." Compact Act, § 103(g)(1), 99 Stat. 1782. As the Claims Court noted in the companion litigation, "[a]n unbroken line of decisions holds that Congress may withdraw its consent to sue the Government at any time." *Juda v. United States,* 13 Cl.Ct. at 689. Existing authorities clearly support this holding by the Claims Court. In *Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934), Justice Brandeis, writing for a unanimous Court, stated "consent to sue the United States is a privilege accorded; not the grant of a property right protected by the Fifth Amendment. The consent may be withdrawn, although given after much deliberation and for a pecuniary consideration." *Id.* at 581, 54 S.Ct. at 844 (citation omitted). While that statement was technically dicta, since the Court held that Congress had not in that case withdrawn consent, *id.* at 583, 54 S.Ct. at 845, there is no indication in any later decision that the dicta is other than an accurate statement of the law. Indeed, in *Maricopa County v. Valley Nat'l Bank of Phoenix,* 318 U.S. 357, 63 S.Ct. 587, 87 L.Ed. 834 (1943), Justice Douglas, again for a unanimous Court, stated, this time as a holding, that

[n]o ... suit [against the United States] may be maintained without the consent of the United States. Such consent, though previously granted, has now been withdrawn. And the power to withdraw the privilege of suing the United States or its instrumentalities knows no limitations.

*Id.* at 362, 63 S.Ct. at 589 (citing *Lynch v. United States, supra* ).

Plaintiffs' argument against withdrawal of jurisdiction is based on a convoluted interpretation of Section 103(g)(2) of the

Compact Act and Article XII of the 177 Agreement. Section 103(g)(2) recites that

[i]t is the explicit understanding and intent of Congress that the jurisdictional limitations set forth in Article XII of [the Section 177] Agreement are enacted solely and exclusively to accomplish the objective of Article X of such Agreement and only as a clarification of the effect of Article X, and are not to be construed or implemented separately from Article X.

Pub.L. No. 99–239, § 103(g)(2), 99 Stat. 1782 (*reprinted in* 48 U.S.C. § 1681 note at 629–30 (Supp. IV 1986)). Subsection (g) bears the caption "Espousal Provisions." Article X of the Section 177 Agreement is likewise headed "Espousal." In international law the doctrine of "espousal" describes the mechanism whereby one government adopts or "espouses" and settles the claim of its nationals against another government. *See generally Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1522–23 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1051, 105 S.Ct. 1751, 84 L.Ed.2d 815 (1985). Reading together the quoted language from Section 103(g)(2) and the heading lines and language of that statute and the cited article of the Section 177 Agreement, plaintiffs argue that Congress's withdrawal of jurisdiction over these claims is a conditional one effective only if the espousal by the Marshall Islands of the claims of its nationals is valid. Plaintiffs then argue that we should review the espousal, find it to be invalid, then find the condition for the withdrawal of jurisdiction not to be met, jurisdiction to exist under the Federal Tort Claims Act, and the District Court to have been in error.

The short answer to plaintiffs' argument that this is the meaning of Section 103(g)(2) is: This is not what the statute says. Section 103(g)(1) expresses "the intention of the Congress of the United States that the provisions of [the Compact and the Section 177 Agreement] constitute a full and final settlement of all claims described in Articles X and XI of the ... Agreement, and that any such claims be terminated and barred except insofar as provided for in the Section 177 Agreement." Pub.L. No. 99–239, § 103(g)(1), 99 Stat. 1782 (*reprinted in* 48 U.S.C. § 1681 note at 629 (Supp. IV 1986)). The Agreement entered by the Executive and approved by Congress expressly states in Article XII "[a]ll claims described in Articles X and XI ... shall be terminated. No court of the United States shall have jurisdiction to entertain such claims, and any such claims pending in the courts of the United States shall be dismissed." Section 177 Agreement, art. XII. Congress could hardly have spoken more explicitly in stripping jurisdiction. Congress has simply deprived the District Court and in turn this Court of jurisdiction to review these claims. As the Claims Court noted in parallel litigation, "[as] enacted, ... Section 103(g) makes no reference as to the validity of espousal on the basis of either international or constitutional law." *Juda v. United States*, 13 Cl.Ct. at 684.

Similarly, as the District Court for the Central District of California noted in other related litigation, if Congress had meant to condition this important international agreement on a review of a fundamental provision therein by the courts, it surely could have included language to that effect. "If Congress wanted to first have the courts test the Compact, it could have said so; instead Congress stripped the court of jurisdiction." *Antolok v. Brookhaven Nat'l Laboratories*, Nos. CV 82–2364, CV 82–4978, slip op. at 8 (C.D.Cal. Jan. 6, 1988). Congress has deprived the courts of the United States of jurisdiction over these claims. It did not deprive the courts of jurisdiction over the substance of the claims until after a review of the espousal question; it deprived the courts of jurisdiction. That is the end of the matter. The language of Section 103(g)(2) upon which plaintiffs rely simply makes it plain that the deprivation of jurisdiction applies not to all claims by the Marshall Islanders against the United States, but only those described in Articles X and XI of the Section 177 Agreement. Presumably, any other claim, under the Federal Torts Claims

Act or other authority, could proceed.[5]

Plaintiffs attempt to bolster their interpretation of Section 103(g)(2) and the incorporated articles of the Agreement and Compact by a single statement of Congressman Seiberling from the legislative history. Seiberling, Chairman of the House Interior Committee's Subcommittee on Public Lands, inserted into the Congressional Record a statement that the relevant language

> is intended to make it clear that court-stripping provisions in article XII of the section 177 agreement have no independent force or effect and their sole function is to implement the provisions of article X. Thus, if article X is valid, the espousal stands; and if article X is invalid, claims covered by the espousal provision will remain justiciable in U.S. courts, regardless of article XII.

131 Cong.Rec. H11829 (daily ed. Dec. 11, 1985).

Again, the short answer to plaintiffs' contention is a simple one. As the Supreme Court has repeatedly reminded us, " '[w]hen ... the terms of a statute [are] unambiguous, judicial inquiry is complete except "in 'rare and exceptional circumstances.' " ' " *United States v. James,* 478 U.S. 597, 606, 106 S.Ct. 3116, 3122, 92 L.Ed. 2d 483 (1986) (quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981) (citations within *Rubin* omitted)). We cannot find the single statement of even an influential Congressman to overcome the plain language of the statute itself, especially where that statement was not spoken in floor debate but rather inserted into the Congressional Record.

Further, if we do go beyond the language of the statute, we find, as the Supreme Court did in *James* in construing a statute rendering the United States immune from flood damage claims, that the legislative history of the Compact Act taken as a whole reinforces, rather than contradicts, the plain language of the statute. An earlier version of 103(g)(2) drafted by Congressman Seiberling and passed by the House would have provided:

> (2) If, notwithstanding the enactment into law of this joint resolution, a United States court of competent jurisdiction determines that the provisions of Article X of the [Section 177 Agreement] are invalid as a matter of international law or for any other reason, the provisions of Article XII ... shall not, of themselves, prevent any court of the United States otherwise having jurisdiction over claims described in Articles X and XI ... from entertaining such claims; and the time between the effective date of the Compact and subsequent final judicial determination of the invalidity of Article X ... shall not be included in any calculations regarding applicable statutes of limitation. ...

H.R.J.Res. 355, 99th Cong., 1st Sess., § 103(g)(2), 131 Cong.Rec. 20,643 (1985).

In the Compact Act as adopted, Congress retained the House-passed version of Paragraph 1 of Section 103(g), affirming the "full and final settlement," but completely rewrote Paragraph 2. *See* Pub.L. No. 99–239, § 103(g)(2), 99 Stat. 1782 (*reprinted in* 48 U.S.C. § 1681 note at 629–30 (Supp. IV 1986)). The prior version supportive of plaintiffs' argument for conditional withdrawal of jurisdiction was deleted in favor of the present language of the statute.

---

**5.** Chief Judge Wald in her concurring opinion suggests that our reading of Section 103(g)(2) renders "that section entirely superfluous." Wald, C.J., Opinion ("Wald Op.") at 388. This is, in fact, no more accurate than it would be for us to assert that her reading of 103(g)(2) renders 103(g)(1) a nullity. However one reads 103(g)(2), it encompasses the jurisdictional bar of 103(g)(1) and subjects it to the light of the Section 177 Agreement. All this establishes is that Congress could have done in one section what it in fact did in two. That Congress chose not to do so does not inform the reader as to

what further intent Congress expressed by adding the disputed "qualification" language of the second section. Chief Judge Wald's criticism of the Government's contention that section 103(g)(2) "simply confirms that [Articles X and XII] are to be implemented together, as already required by the terms of the Agreement itself," Brief for the United States at 16, is even less helpful. For the statute to expressly adopt an intent expressed in the Agreement is not a superfluity but is in fact the granting of force of statute to a provision previously bearing the force of compact or agreement.

Congressman Seiberling's insertion into the Congressional Record cannot reinstate the provision which Congress refused to enact. The section-by-section analysis of the Compact Act prepared by the Senate managers of the legislation states that Section 103(g) "reiterates the provisions of Section 177 of the Compact which provide that there is *full and final settlement* of all nuclear effects claims." 131 Cong. Rec. 36,468 (1985) (emphasis supplied). The Senate analysis further expressed an understanding of subsection (g) that in light of concerns over "protracted litigation" "an explicit endorsement of the resolution was important." *Id.*[6]

Moreover, at least one other speaker on the House floor contradicted the interpretation of the statute offered in Congressman Seiberling's insertion. Congressman Solarz expressly stated "the compact settles all nuclear claims resulting from our nuclear weapons testing program in Micronesia." 131 Cong.Rec. 36,039 (1985).

The contradiction between Congressmen Seiberling and Solarz need not dismay us, nor need we seek to resolve it. It may simply remind us once again that

> an endemic interplay, in Congress, of political and legislative considerations ... makes it necessary for judges to exercise extreme caution before concluding that a statement made in floor debate, or at a hearing, or printed in a committee document may be taken as statutory gospel. Otherwise, they run the risk of reading authentic insight into remarks intended to serve quite different purposes.

*International Bhd. of Elec. Workers, Local Union No. 474 v. NLRB,* 814 F.2d 697, 717 (D.C.Cir.1987) (Buckley, J., concurring).

While it is only waggishly stated that "where the statutory history is ambiguous we will look to the words of the statute," our result in this case would be unchanged if that were the proper canon of statutory construction. Congress has stripped the courts of jurisdiction over these claims. We are not surprised, but are bolstered, in our confidence in our interpretation of the statute that the Claims Court in *Juda,* the Federal Circuit in *People of Enewetak* and in *People of Bikini,* and the District Court for the Central District of California in *Antolok v. Brookhaven Nat'l Laboratories* have all viewed the jurisdictional question consistently with our decision today. *See supra* note 3.

Before closing our analysis of the statutory bar to jurisdiction, we note that plaintiffs have attempted to shore up their interpretation of the statute by arguing that the literal interpretation of the statute adopted by the District Court and by us herein raises a constitutional difficulty avoided by accepting their more convoluted interpretation. This argument, relying on *In re Consol. United States Atmospheric Testing Litigation v. United States,* 820 F.2d 982 (9th Cir.1987), asserts that the plaintiffs' claims for relief against the United States are a "'species of property protected by the Fourteenth Amendment's Due Process Clause.'" *Id.* at 988 (citation omitted). Thus, they argue, while this does not necessarily mean that the claims have the same Fifth Amendment protections accorded real

---

**6.** Although we do not rely on this legislative history as essential to our interpretation of the statute, we note that Chief Judge Wald finds our citation of the section-by-section analysis to be "an unconvincing argument." Wald Op. at 389. She contends that the "final settlement" language means nothing more than that Congress thought its resolution would withstand judicial review rather than that Congress intended its solution to evade judicial review. Her interpretation ignores the further language of the section-by-section analysis that the "Senate and House agreed that an explicit endorsement of the resolution was important," "[i]n light of the statement made by some more interested in protracted litigation than compensation for the victims of the testing program." 131 Cong.Rec.

36,468 (1985). Unless it was Congress's intent in adopting 103(g)(2) that such litigation should be avoided rather than won, this portion of the section-by-section analysis makes no sense. Similarly, we think her reliance on the statement of Congressman Lagomarsino, 132 Cong. Rec. 520 (1986) (Wald Op. at 390), is ill-placed. The Congressman's expressed expectation that the United States will prevail if challenged in court on the Section 177 Agreement is as consistent with a view that the jurisdiction-stripping provisions will stand constitutional scrutiny, as with the view that the underlying espousal will. His statement is at best ambiguous, since it contains reference not only to the espousal provisions themselves but also the Senate's section-by-section analysis cited above.

or personal property, nonetheless each plaintiff has the "right to assert a claim for compensation or some other form of judicial relief." *Id.* at 989.

This argument proves far too much. If we adopted the Ninth Circuit's language and gave it the interpretation sought by plaintiffs, we would fly in the face of the language quoted above from *Lynch* and *Maricopa County*. Indeed, in *Lynch*, the dicta approving the power of Congress to eliminate claims from the jurisdiction of the courts was pronounced by a Court striking down on Fifth Amendment grounds a statute which, rather than limiting jurisdiction, was, in fact, abrogating obligations of the United States. 292 U.S. at 579–80, 583–85, 54 S.Ct. at 845–46. Had jurisdictional limitation partaken of the same constitutional infirmity, it is hardly likely that the Court would have been at pains to distinguish stripping of jurisdiction from abrogation of claims. In *Lynch*, the Supreme Court expressly held "[r]ights against the United States arising out of a contract with it are protected by the Fifth Amendment." *Id.* at 579, 54 S.Ct. at 843 (citations omitted). At the same time it noted in dicta that "consent to sue the United States is a privilege accorded; not the grant of a property right protected by the Fifth Amendment." *Id.* at 581, 54 S.Ct. at 844. Plaintiffs' argument cannot survive in light of this distinction. Likewise, in *Maricopa County* the Supreme Court reviewed a statute withdrawing, as to preferred shares held by a United States agency, a previously granted statutory right of the several states to collect taxes on the stock of national banks. Plaintiff in that case argued that the retrospective application of the statute violated the Fifth Amendment by destroying the liens of taxes impressed before the effective date of the Act. The Court rejected this argument, citing *Lynch* for the proposition that "the power to withdraw the privilege of suing the United States or its instrumentalities knows no limitations." 318 U.S. at 362, 63 S.Ct. at 589.

We would further note, that even if the legislation amounted to an actual taking of property (and we do not read plaintiffs' complaint to so state) then the substitution of another remedy is compensation therefor. This is in fact consistent with the Ninth Circuit's decision in *In re Consol. United States Atmospheric Litigation* relied on by plaintiffs. There the Court held that the substitution of Federal Tort Claims Act liability for preexisting common law tort liability of government contractors was no violation of the Fifth Amendment. 820 F.2d at 988–89. While we recognize that plaintiffs' argument in the present case is slightly stronger, since the substituted remedy here is against the fund provided under the settlement agreement rather than in an Article III court, this difference in no way grants us jurisdiction. If there is an uncompensated or inadequately compensated taking, then plaintiffs' remedy is in the Claims Court under the Tucker Act, 28 U.S.C. § 1491(a)(1), not in District Court under the Federal Torts Claims Act. *See Juda v. United States*, 13 Cl.Ct. at 686–87. Therefore, the District Court did not err in its dismissal.

Since plaintiffs have not alleged a valid constitutional claim over which our Court has jurisdiction, we do not face the difficult question of whether inferior courts may be barred by an act of Congress from review of constitutional challenges to statutes. *See Johnson v. Robison*, 415 U.S. 361, 366, 94 S.Ct. 1160, 1165, 39 L.Ed.2d 389 (1974) (barring federal courts from deciding constitutionality of statute would "raise serious questions"); *but see Webster v. Doe*, —— U.S. ——, 108 S.Ct. 2047, 2057–60, 100 L.Ed.2d 632 (1988) (Scalia, J., dissenting) (Congress has authority to preclude lower court review of constitutional claims). Chief Judge Wald expresses a further constitutional concern as to the validity of an act of Congress restricting access to courts by jurisdictional-stripping statutes based on constitutionally suspect criteria. Wald Op. at 386–388. Certainly a constitutional enactment that limited access to the courts on the basis of some category such as race would immediately raise our constitutional hackles. This is not that statute. Just as Congress has previously left us without jurisdiction over certain intentional torts committed by non-law enforcement

federal personnel, *inter alia*, in 28 U.S.C. § 2680(h), so now Congress deprives us of jurisdiction over claims arising from tortious acts by negligence or intent in the conduct of a broad and years-long nuclear testing program. While Chief Judge Wald is concerned by the "narrow" class of claims taken from our jurisdiction, this is in no sense narrower than the claims discussed in *Lynch*. While concededly dicta, the Supreme Court there made it plain that while the consent to sue had not been withdrawn, it could have been, "although given after much deliberation and for a pecuniary consideration." 292 U.S. at 581, 54 S.Ct. at 844. Those claims belonged to the beneficiaries of insured veterans. The present claims belong to nationals of the Marshall Islands. The distinction appears to us to be without difference.

Chief Judge Wald's attempt to treat this as a suspect category case simply is without foundation. As far as her reference to the racial "group" to which most plaintiffs "seem[ ] likely" to belong, Wald Op. at 386 –387, there is no indication that this fact, if it is a fact, was known to Congress or material to entry into the Compact or to enactment of the legislation. Indeed, no party to this law suit and no court construing these claims has ever given us the slightest record that the plaintiffs are Asians, Polynesians, or of mixed extraction. This silence is probably due to the fact that that question has nothing to do with the case.[7] Plaintiffs have not in this or any other litigation ever alleged any racial discrimination. Indeed, Chief Judge Wald notes as much at footnote 17 of her separate opinion, where she states that "racial discrimination" is an example of a peremptory norm of international law, and that "[p]laintiffs here do not contend that the espousal violates a peremptory norm of international law, nor do[es] [she] believe that such a claim is tenable." Wald Op. at 393–94 n. 17. Neither does the nationality of the plaintiffs create a suspect category in the present case. This is not as Chief

Judge Wald suggests a case of classification by "national origin." This is an international agreement regarding an espousal of claims by the nationals of one nation against the government of another. It simply is impossible that such an espousal agreement can be entered on behalf of anyone other than nationals of the government involved.

In short, once again, we conclude that we do not face the difficult question of a congressional enactment barring from inferior court review a constitutional challenge, and once again we conclude that the District Court committed no error.

### B. Political Question Doctrine

While, of course, our conclusion that the Compact Act incorporating the international agreements expressly stripped the courts of jurisdiction is sufficient to dispose of this appeal, even if we err in our interpretation of that Act, I would not reach the merits but would conclude that the District Court was without jurisdiction over this matter of international relations by reason of the political question doctrine. The law has recognized since 1803 that certain political decisions are by their nature committed to the political branches to the exclusion of the judiciary. In *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 164, 2 L.Ed. 60 (1803), Chief Justice Marshall recognized the existence of cases to be considered "political act[s], belonging to the executive department alone, for the performance of which entire confidence is placed by our constitution in the supreme executive; and for any misconduct respecting which, the injured individual has no remedy...." Since *Marbury v. Madison*, the political question doctrine has gradually emerged as a limitation on jurisdiction affecting areas as diverse as foreign relations, *Oetjen v. Central Leather Co.*, 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918); dates of duration of hostilities and related war powers legislation, *Commercial*

---

**7.** The only reference to the ethnicity of the plaintiffs known to us is cited in footnote 6 of Chief Judge Wald's opinion. That is the House Report referencing "six distinct ethnic groups speaking nine different languages." H.R.Rep. No. 188, Part 1, 99th Cong., 1st Sess. 3 (1985), U.S.Code Cong. & Admin.News 1985, pp. 2746, 2748.

*Trust Co. v. Miller*, 262 U.S. 51, 43 S.Ct. 486, 67 L.Ed. 858 (1923); the status of Indian tribes, *United States v. Holliday*, 70 U.S. (3 Wall.) 407, 18 L.Ed. 182 (1865); and the existence of a republican form of government, *Luther v. Borden*, 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849); *Pacific States Tel. & Tel. Co. v. Oregon*, 223 U.S. 118, 32 S.Ct. 224, 56 L.Ed. 377 (1912); see also authorities collected in *Baker v. Carr*, 369 U.S. 186, 208–26, 82 S.Ct. 691, 705–15, 7 L.Ed.2d 663 (1962).[8]

In the area of foreign relations, Chief Justice Marshall in *United States v. Palmer*, 16 U.S. (3 Wheat.) 610, 4 L.Ed. 471 (1818), described questions of foreign policy as "belong[ing] more properly to those ... who can place the nation in such a position with respect to foreign powers as to their own judgment shall appear wise; *to whom are intrusted all its foreign relations;* than to that tribunal whose power as well as duty is confined to the application of the rule which the legislature may prescribe for it." *Id.* at 634 (emphasis added).

Over the years, the precedent that questions of foreign relations lie within the sphere of political questions committed to the other branches to the exclusion of the judiciary became deeply ingrained. *See, e.g., Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 307–10, 7 L.Ed. 415 (1829); *Garcia v. Lee*, 37 U.S. (12 Pet.) 511, 517–18, 520–21, 9 L.Ed. 1176 (1838); *Williams v. Suffolk Ins. Co.*, 38 U.S. (13 Pet.) 415, 420, 10 L.Ed. 226 (1839); *In re Cooper*, 143 U.S. 472, 499, 12 S.Ct. 453, 459, 36 L.Ed. 232 (1892). In 1918, the Supreme Court heard the case of *Oetjen v. Central Leather Co.*, 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918), in which the American plaintiff had sought replevy of two consignments of hides seized by one of the warring fractions in the Mexican Revolution. By the time of the litigation, the hides had acquired a situs in the United States and the government of the United States had recognized the seizing faction as the legitimate government of Mexico, retroactive to the commencement

of its acts as a *de facto* government. *See also Ricaud v. American Metal Co.*, 246 U.S. 304, 308–09, 38 S.Ct. 312, 313–14, 62 L.Ed. 733 (1918). In holding that the plaintiff's remedy, if any, did not lie within the jurisdiction of the courts of the United States, the *Oetjen* Court stated "[t]he conduct of the foreign relations of our Government is committed by the Constitution to the Executive and the Legislative—'the political'—Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Oetjen v. Central Leather Co.*, 246 U.S. at 302, 38 S.Ct. at 311.

Given the sweep of this holding, it might appear that we would be justified in holding that the political question doctrine deprives the judiciary of jurisdiction over the present case without further discussion. However, in *Baker v. Carr*, the Supreme Court, while recognizing that "[t]here are sweeping statements to the effect that all questions touching foreign relations are political questions [citing *Oetjen* ] [and that] ... resolution of such issues frequently turn[s] on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature [and] ... many such questions uniquely demand single-voiced statement of the government's views," nonetheless, stated that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker v. Carr*, 369 U.S. at 211, 82 S.Ct. at 707 (footnotes omitted). The *Baker* Court went on to recognize that cases in this field "show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." *Id.* at 211–12, 82 S.Ct. at 706–07. Therefore, since I would hold this doctrine to be an alternative basis for our decision in this

---

**8.** The cited portion of *Baker v. Carr* contains a broad, historic outline of the application of the political question doctrine. This history having been furnished by the Highest Court, we will avoid replication except insofar as necessary to the decision of the present case.

case, I will undertake such a "discriminating analysis." In conducting the analysis directed by *Baker v. Carr*, I am mindful of the three inquiries more recently formulated by Justice Powell as defining the analysis necessary to determine the application of the political question doctrine.

(i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of Government? (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? (iii) Do prudential considerations counsel against judicial intervention?

*Goldwater v. Carter*, 444 U.S. 996, 998, 100 S.Ct. 533, 534, 62 L.Ed.2d 428 (1979) (Powell, J., concurring). While this formulation is the product of a separate concurring opinion of a single Justice in a judgment announced *per curiam*, we have previously applied it as an appropriate test for determining whether or not a particular issue touching on foreign relations falls within the political question category in *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1511 (D.C.Cir.1984) (*en banc*). Consistent with the Circuit practice so established, I will apply the same criteria in the present case.

First, we must determine whether the decision of the political branches expressed in the Compact negotiated and entered by the Executive and approved by the Legislative Branch is within the area of foreign relations committed by the Constitution to the political branches. As we noted in *Ramirez*, "[t]he first of these formulations requires the court to determine whether the text of the Constitution implicitly or explicitly commits the stated claim to the political branches. According to the Supreme Court, this necessitates a close textual analysis of specific provisions of the Constitution." *Id.* at 1511.

Since this particular matter of foreign relations involves the entry by the United States into an international agreement and the recognition of a new foreign government and receipt by the President of its representatives,[9] we look to Article II, sections 2 and 3 of the Constitution. Article II, section 2 empowers the Executive "by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and [to] nominate, and by and with the Advice and Consent of the Senate, ... appoint Ambassadors, other public Ministers and Consuls...." U.S. Const., art. II, § 2, cl. 2. Section 3 empowers the Executive to "receive Ambassadors and other public Ministers." U.S. Const., art. II, § 3. These sections represent the entire allocation of constitutional power concerning the entering into international agreements and recognition of foreign states. While the treaty power of the Executive expressly involves the participation of the Legislature, nowhere does the Constitution contemplate the participation by the third, non-political branch, that is the Judiciary, in any fashion in the making of international agreements or the recognition of foreign governments. I determine, therefore, that this is one of those areas of foreign relations textually committed to the political branches to the exclusion of the Judiciary.

I am guided in this determination by the Supreme Court's determinations in a series of cases concerning the "Litinov Assignment" between the government of the Union of Soviet Socialist Republics and the United States: *United States v. Bank of New York & Trust Co.*, 296 U.S. 463, 56 S.Ct. 343, 80 L.Ed. 331 (1936); *United States v. Belmont*, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); *Guaranty Trust Co. v. United States*, 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224 (1938); and *United States v. Pink*, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942). The Litinov Assignment came into being after years of refusal by the United States to recognize the U.S.S.R. as the *de jure* government of Russia and came as an incident to the recognition of that government by the United States in 1933. The Assignment concerned the settlement of certain claims and counterclaims arising in large part from the nationalization by the U.S.S.R. of the insurance business and all property of Russian insurance

---

**9.** *See* Compact, tit. one, art. V, 99 Stat. 1806–07.

companies including that situated in the United States. *United States v. Pink*, 315 U.S. at 210–11, 62 S.Ct. at 556. Because this Assignment and settlement adversely affected the economic interests of American nationals and other persons and entities capable of bringing suit in the courts of the United States, and because it ran counter to American constitutional and jurisprudential concepts of protected property interests, litigation ensued in the courts of the United States and several states which reached the Supreme Court in various procedural postures. While the separate opinions deal with separate aspects of the controversy in different fashions, a single thread runs throughout those cases and controls our decision on the instant question. That thread, as expressed in *Belmont*, is that "in respect of what was done here, the Executive had authority to speak as the sole organ of [the United States] government." 301 U.S. at 330, 57 S.Ct. at 760. The *Belmont* Court so recognized, even though the Litinov Assignment did not rise to the status of a treaty and was not therefore entered with the advice and consent of the Senate under the treaty-making clause of Article II, section 2 of the Constitution. 301 U.S. at 330–31, 57 S.Ct. at 760–61. As further elucidated in *Guaranty Trust*, "[w]hat government is to be regarded here as representative of a foreign state is a political rather than a judicial question, and is to be determined by the political department of the government." 304 U.S. at 137, 58 S.Ct. at 791 (quoted and followed in *United States v. Pink*, 315 U.S. at 229, 62 S.Ct. at 565). This particular application of the political question doctrine to the field of foreign relations has not been eroded by further Supreme Court decisions. Indeed, in *Baker v. Carr*, the Supreme Court, albeit in dicta, reminded us again that "recognition of foreign governments so strongly defies judicial treatment that without executive recognition a foreign state has been called 'a republic of whose existence we know nothing.'" 369 U.S. at 212, 82 S.Ct. at 707 (quoting *United States v. Klintock*, 18 U.S. (5 Wheat.) 144, 149, 5 L.Ed. 55 (1820)).

Plaintiffs argue that they are not attacking the recognition, but only the distinct settlement of the claims, not necessarily an incident of recognition. However, to hold as plaintiffs urge would require that we virtually ignore the Supreme Court's opinion in *United States v. Pink*. Obviously the cases are factually distinct. The present matter involves a purported "espousal" not amounting to the sort of nationalization involved in *Belmont*. 301 U.S. at 326, 57 S.Ct. at 759. Some of the Litinov Assignment cases discuss the intervention of state courts where the present case raises no question of state prerogatives. Nonetheless, the distinctions are without difference material to the questions we decide. In *Pink*, the Supreme Court, dealing with similar arguments to those raised by plaintiff herein, noted that "[t]he Litinov Assignment was ... part and parcel of the new policy of recognition ... [;] it was also the method adopted by the Executive Department for alleviating in this country the rigors of nationalization. Congress tacitly recognized that policy." 315 U.S. at 227, 62 S.Ct. at 564. In the present case, the Section 177 Agreement was expressly part and parcel of the Compact providing recognition of the government of the Republic of the Marshall Islands and the method chosen by the Executive for dealing with the outstanding claims arising from nuclear testing. Congress more than tacitly approved the agreement and indeed adopted it in the strongest of terms as the express "intention of the Congress of the United States that the provisions of [the Compact and the 177 Agreement] constitute a full and final settlement of all claims described in Articles X and XI." Pub.L. No. 99–239, § 103(g)(1), 99 Stat. 1782 (*reprinted in* 48 U.S.C. § 1681 note at 629 (Supp. IV 1986)).

Plaintiffs' arguments against the validity of the 177 Agreement are directed toward perceived improprieties and inequities in the bargaining leading to the agreement. Again, the policy of recognizing nationalization in *Pink* was no more acceptable to many Americans than is the policy of entering an espousal-dependent settlement of claims by nationals of a trust territory to

plaintiffs. But, as the *Pink* decision informs us, the "authority [of recognition] is not limited to a determination of the government to be recognized. It includes the power to determine the policy which is to govern the question of recognition. Objections to the underlying policy as well as objections to recognition are to be addressed to the political department and not to the courts." 315 U.S. at 229, 62 S.Ct. at 565 (citing, *inter alia, Guaranty Trust Co. v. United States*, 304 U.S. at 138, 58 S.Ct. at 791).

As the *Pink* Court further observed, the power to recognize the government necessarily implies in the President the "[p]ower to remove such obstacles to full recognition as settlement of claims.... Effectiveness in handling the delicate problems of foreign relations requires no less." 315 U.S. at 229, 62 S.Ct. at 565.[10] As it was the judgment of the political department in dealings with the Soviet Union that the settlement of certain " 'questions outstanding,' " *id.* at 227, 62 S.Ct. at 564, was necessary for full recognition of that government, so it was the decision of the political branches in the present case that settlement of the nuclear testing claims was necessary for full recognition of the Republic of the Marshall Islands as an independent government.

Chief Judge Wald argues that the present controversy falls outside the political question doctrine on the basis of the Supreme Court's consideration of questions with "potentially substantial impact on foreign relations," Wald Op. at 391, in *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986). However, in that case, all the courts were called upon to do was construe the meaning of a concededly valid treaty. In that very case, the Supreme Court stated "the political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Id.* at 230, 106 S.Ct. at

2866. I think it plain that this present case more closely parallels the *Pink* and *Belmont* line than the *Japan Whaling* decision. Here, as in *Pink* and *Belmont*, we are called upon by plaintiffs not to construe the international agreement for its meaning but rather to review the policies that underlie the very recognition of another sovereign by our own. I, therefore, find the Chief Judge's citation of the later case unpersuasive as it appears to me that it changes nothing in the pre-existing and applicable line of Supreme Court decisions.

While I do not deny that the plaintiffs herein raise good faith objections to the decision of the Executive and while they have every right to disagree with the Executive and Legislative determinations that the settlement was required, was just, or was correct, our deferral to the political branches in political questions is not limited to those where they are correct. It would require our invasion of their sphere for us to make the determination that they were wrong, and it is against that very invasion that the political question doctrine protects the political realm from judicial invasion.

Plaintiffs further argue that, under the second of the three criteria set forth by Justice Powell, this is not a matter beyond the areas of judicial expertise. As plaintiffs view the cause, these are simply questions of tort liability and damages—obviously matters within normal judicial competence. Were we to follow plaintiffs' view, there would hardly be a political question doctrine left. As this is a tort case, so was *Belmont* a contract action and *Oetjen* an action for replevin. Indeed, it is difficult to conceive of a case reaching court that did not have some foundation in legal questions. Yes, this is a tort case. But the doctrine which precludes our review is " 'one of "political questions," not one of "political cases." ' " *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 934 (D.C.Cir.1988) (quoting *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. at 710). It is the political nature of

---

**10.** The full quotation in *Pink* deals with settlement of claims of our nationals. The Litinov reasoning, however, fully supports the President's power to deal with the claims of the nationals of the other governmental party to the Compact.

the recognition question, not the tort nature of the individual claims, that bars our review and in which the Judiciary has no expertise. Again, without the act of the Executive, the Republic of the Marshall Islands would be one "of which we know nothing."

Thirdly, prudential considerations underline the necessity for the application of the doctrine in this case. The governments of the United States and the Republic of the Marshall Islands, together with the United Nations, have commenced recognition and international relations reference the Marshall Islands based on an agreement entered by the perceived "sole organ" of recognition by the United States Government. As the Supreme Court has repeatedly held, the sensitive considerations of international relations "uniquely demand single-voiced statement of the Government's views." *Baker v. Carr*, 369 U.S. at 211, 82 S.Ct. at 707 (footnote omitted). For the courts of the United States to find the political branches, acting together, to have been impotent in the entry of recognition of the Marshall Islands would not only drain that voice of its power, but could " 'imperil the amicable relations between governments and vex the peace of nations.' " *United States v. Pink*, 315 U.S. at 233, 62 S.Ct. at 567 (quoting *Oetjen*, 246 U.S. at 304, 38 S.Ct. at 311). Plaintiffs argue that it would not, but that is simply not our decision to make.

Plaintiffs finally urge that we should be persuaded to find the questions in this cause justiciable since the Supreme Court has adjudicated the validity of an international settlement in *Dames & Moore v. Regan*, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981). That case affirmed the validity of "Executive Orders and regula-

tions by which the President nullified attachments and liens on Iranian assets in the United States, directed that these assets be transferred to Iran, and suspended claims against Iran" in furtherance of an Executive agreement under which American diplomatic personnel held hostage by Iran were released. *Id.* at 660, 101 S.Ct. at 2976. It is in no sense parallel to the present case or the Litinov Assignment cases in which international settlement agreements are part and parcel of recognition decisions. In *Dames & Moore*, the Supreme Court, itself, acted on an expedited basis honoring a fixed deadline only a few days after the pronouncement of the Supreme Court's decision. Justice Rehnquist, writing for the Court, was at pains to restrict the decision to its facts, stating "[w]e attempt to lay down no general 'guidelines' covering other situations not involved here, and attempt to confine the opinion only to the very questions necessary to decision of the case." 453 U.S. at 661, 101 S.Ct. at 2977. The Court further specified that it had no intention to "dramatically alter" existing authority and recalled that "the Framers 'did not make the judiciary the overseer of our government.' " *Id.* at 660, 101 S.Ct. at 2976 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 594, 72 S.Ct. 863, 889, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring)). Thus, *Dames & Moore* is not authority for the proposition that we can review the political decision to recognize the government of the Republic of the Marshall Islands on terms including the settlement condition but rather is new authority for the old proposition that we are not the overseers of the political branches in the exercise of their governing responsibility.[11]

---

**11.** The United States in its brief on the political question issue argues in a footnote that the "act of state" doctrine provides an independent basis for affirming the District Court's dismissal of this case for lack of subject matter jurisdiction. That doctrine counsels that United States courts " 'will not sit in judgment on the acts ... of another [country] done within its own territory.' " *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 416, 84 S.Ct. 923, 934, 11 L.Ed.2d 804 (1964) (quoting *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897)).

Like the political question doctrine, "[t]he act of state doctrine is grounded in concerns that 'application of customary principles of law to judge the acts of a foreign sovereign might frustrate the conduct of foreign relations by the political branches of the government," *Millen Indus. v. Coordination Council for N. Am. Affairs*, 855 F.2d 879, 882 (D.C.Cir.1988) (quoting *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 767–68, 92 S.Ct. 1808, 1813–14, 32 L.Ed.2d 466 (1972)). Because we deem the District Court to have been correct in holding itself

### III. CONCLUSION

For the reasons set forth above, we determine that the District Court correctly concluded that it had no jurisdiction over this case. The decision of that Court to dismiss is, therefore, affirmed.

WALD, Chief Judge, concurring in judgment only:

Although I agree with my colleagues that the plaintiffs' suit for damages against the United States should be dismissed, I reach that conclusion by a different route. I believe that Congress did intend that the statutory provisions depriving federal district courts of jurisdiction over the underlying tort suit would be contingent on the validity of the espousal agreement. I also conclude that the plaintiffs' central challenge to the espousal agreement is suitable for judicial resolution and does not present a political question. In my view, however, the espousal arrangement at issue here is an entirely valid international agreement. I therefore agree that the restrictions on federal jurisdiction should be enforced and the suit should be dismissed.

### I. ARE THE JURISDICTION-STRIPPING PROVISIONS DEPENDENT ON THE VALIDITY OF THE ESPOUSAL?

#### A. *Constitutional Concerns*

The majority regards the jurisdiction-stripping provisions of the Compact of Free Association Act as separate and apart from the espousal agreement. In my colleagues' view, the Congress has plenary power to strip the federal district courts of jurisdiction, at least over nonconstitutional claims, whatever the legal status of the espousal.

This argument presumes that Congress could constitutionally have withdrawn the government's consent to suit on these claims even if it had provided no alternative compensation mechanism at all. I find that assumption quite problematic.

The majority's position rests in large part on the fact that the plaintiffs' underlying claim for relief sounds in tort. While much controversy surrounds the extent of Congress' obligation to provide a judicial forum for the vindication of *constitutional* claims, *see, e.g., Bartlett v. Bowen,* 816 F.2d 695 (D.C.Cir.1987); *see also Webster v. Doe,* — U.S. —, 108 S.Ct. 2047, 2053, 100 L.Ed.2d 632 (1988) (noting "the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim"), there has been next to no discussion of jurisdiction-stripping practices where nonconstitutional claims are concerned.[1] The Federal Tort Claims Act is of course a fairly recent innovation, and no one suggests that it is constitutionally compelled. The Act contains a number of exceptions, and Congress could clearly enact new ones. The government in essence portrays the Compact Act as simply one more exception to the FTCA: "Since there manifestly was no constitutional requirement that Congress waive the sovereign immunity of the United States for tort claims, there is likewise no constitutional impediment to the reassertion of immunity to bar the further exercise of court jurisdiction over these claims." Brief for United States at 22–23. Therefore, the government argues, Congress could have removed these claims from the jurisdiction of the

to be without jurisdiction on other grounds, we have no occasion to consider this further argument, and, therefore, like the brief proposing it, we relegate it to a footnote.

**1.** The presence of constitutional doubts concerning the power of Congress to withdraw federal jurisdiction over constitutional claims is not, however, entirely irrelevant to the present case. The Compact Act espoused, and withdrew federal jurisdiction over, constitutional as well as nonconstitutional causes of action. Under the majority's construction of the statute, the

jurisdiction-stripping provisions are to be implemented without regard to the propriety of the espousal. My colleagues thus impute to Congress the view that the federal courts may be stripped of jurisdiction over constitutional claims even if no alternative remedy is provided. Admittedly, our resolution of this tort suit does not require us to decide whether Congress actually possesses such power. But in interpreting the statute, we should not lightly presume that Congress intended to take so constitutionally problematic a step.

federal courts even without creating an alternative compensation system.

Some Supreme Court opinions contain expansive language regarding the power of Congress to reassert the sovereign immunity of the United States. *See, e.g., Lynch v. United States,* 292 U.S. 571, 581, 54 S.Ct. 840, 844, 78 L.Ed. 1434 (1934) ("The rule that the United States may not be sued without its consent is all embracing."); *Maricopa County v. Valley National Bank,* 318 U.S. 357, 362, 63 S.Ct. 587, 589, 87 L.Ed. 834 (1943) (citing *Lynch* for the proposition that "the power to withdraw the privilege of suing the United States or its instrumentalities knows no limitations"). Despite this sweeping language, it seems to me that there must be some limits on Congress' ability to reassert sovereign immunity, even over nonconstitutional claims.

The government's position is in essence that, since the United States need not *ever* consent to be sued for damages, it has absolute authority to define the circumstances under which suit will be permitted. This contention, however, cannot be accommodated with equal protection doctrine generally, which clearly holds that even government "privileges" may not be allocated in a discriminatory manner.[2] This exception is particularly relevant in a case involving access to the courts.[3] Certainly Congress could have repealed the FTCA entirely, and it could have provided that the

FTCA would not apply to suits arising out of U.S. nuclear testing. I cannot believe, though, that Congress could amend the Act to provide that blacks cannot sue the United States for damages. A slightly different constitutional problem would be posed by a statute providing that a particular individual cannot invoke the FTCA. Such a statute would appear to deny equal protection and would also implicate values protected by the bill of attainder clause. The same sorts of problems, it appears to me, would arise here if the jurisdiction-stripping provisions of the Compact Act stood alone.

The jurisdiction-stripping language (considered in isolation) does not define a neutral class of claims (*e.g.,* all claims arising from nuclear testing) for which consent to suit has been withdrawn. Nor does it distinguish between citizen and alien,[4] or between domestic and extraterritorial claims[5]—distinctions which, while not without their drawbacks, would probably in my view withstand constitutional scrutiny. Rather, the Act singles out a narrow group of claimants, and a narrow class of claims, which are in all relevant respects (save, of course, for the existence of the Compact and the espousal, which for the sake of this discussion we must ignore) indistinguishable from other claims and claimants for which a federal cause of action remains. It seems likely, moreover, that the great majority of these plaintiffs are Asians;[6] and

**2.** The Supreme Court "now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.'" *Graham v. Richardson,* 403 U.S. 365, 374, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534 (1971). The Court's sweeping pronouncements in *Lynch* and *Maricopa County,* it might be noted, were issued in an era when the right-privilege distinction held far greater sway. *See generally* Van Alstyne, *The Demise of the Right–Privilege Distinction in Constitutional Law,* 81 Harv.L.Rev. 1439 (1968).

**3.** *Cf. Lindsey v. Normet,* 405 U.S. 56, 77, 92 S.Ct. 862, 876, 31 L.Ed.2d 36 (1972) ("This Court has recognized that if a full and fair trial on the merits is provided, the Due Process Clause of the Fourteenth Amendment does not require a State to provide appellate review.... When an appeal is afforded, however, it cannot be granted to some litigants and capriciously or arbitrarily denied to others without violating the Equal Protection Clause.").

**4.** In my view a law providing that "citizens may sue the United States for damages, but aliens may not" would be far less constitutionally suspect than a law providing that "aliens of British ancestry may sue the United States for damages, but aliens of Japanese ancestry may not."

**5.** The Federal Tort Claims Act contains a foreign claims exception. *See* 28 U.S.C. § 2680(k).

**6.** The record contains no precise delineation of the racial or ethnic characteristics of the plaintiff class. One House committee report states that "[t]he Trust Territory of the Pacific Islands, commonly referred to as Micronesia, consists of over 2,000 islands scattered over 3 million square miles of ocean. The population of 130,-000 live on some 100 islands and consist of six distinct ethnic groups speaking nine different languages." H.R.Rep. No. 188, Part 1, 99th Cong., 1st Sess. 3 (1985), U.S.Code Cong. & Admin.News 1985, pp. 2746, 2748 (App. I at

Asians have, through most of our country's history, been subjected to repeated racial discrimination. Against this backdrop, I cannot accept my colleagues' blithe assumption that withdrawal of jurisdiction implicates no constitutional concerns.

The dearth of record information concerning the plaintiffs' racial characteristics —or the existence of ethnic variations within the Micronesian community—does not (as my colleagues suggest, *see* Majority opinion (Maj. op.) at 378–79) eliminate the danger of invidious discrimination. After all, national origin is itself a suspect basis for government classification. *See Hernandez v. Texas*, 347 U.S. 475, 479, 74 S.Ct. 667, 671, 98 L.Ed. 866 (1954). The Compact, which withdraws federal jurisdiction over "all claims, past, present and future, of the Government, citizens and nationals of the Marshall Islands which are based upon ... the Nuclear Testing Program," clearly differentiates upon this basis. For purposes of equal protection review, the crucial question is not whether a precisely definable racial or ethnic class is involved, but whether "the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied." *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). It seems quite plain to me that the Marshall Islanders do comprise such a group.

My colleagues argue that no suspect classification based on national origin exists because an espousal agreement by its very nature can settle only the claims of a particular country's nationals. *See* Maj. op. at 379. I agree, but I do not see how this argument can be reconciled with the rest of the majority's analysis. I readily concede that, *within the context of the Compact as a whole*, there is an obvious, legitimate, nondiscriminatory reason for singling out this group of potential plaintiffs. The problem lies with the majority's insistence on reviewing, and approving, the jurisdiction-stripping provision in isolation. My colleagues contend that the espousal

and the withdrawal of jurisdiction are severable provisions, and they would uphold the latter without examination of the former. Yet in rebutting the inference of discrimination that a selective withdrawal of jurisdiction would create, they point out that the withdrawal of jurisdiction is only a part of a complex international agreement.

If the jurisdiction-stripping provision of this bill stood alone, it would raise grave constitutional concerns. The class of claims over which federal jurisdiction has been withdrawn has not been defined by neutral criteria. Rather, the statute has identified a very narrow set of claimants, defined on the basis of nationality, most of whom would appear to belong to a racial group which, by traditional equal protection standards, constitutes a suspect class. I certainly do not suggest that the espousal of these claims is an act of racial discrimination; my point is simply that, *if* the jurisdiction-stripping provisions were reviewed in isolation, the racial composition of the plaintiff class would surely be a relevant concern. I am not prepared to state categorically that the Constitution would forbid Congress to withdraw its consent to suit on these claims without providing an alternative means of redress. I do believe, though, that the constitutional doubts concerning such a statute are strong enough that the Compact of Free Association Act should be construed, if possible, so as to avoid these difficulties. In my view, the petitioners' construction of the statute—under which the government's withdrawal of consent to suit is conditioned upon the validity of the espousal—alleviates these constitutional doubts and is fully consistent with both the language and history of the Act.

B. *Statutory Language*

Section 103(g)(2) of the CFAA states:
It is the explicit understanding and intent of Congress that the jurisdictional limitations set forth in Article XII of such Agreement are enacted solely and exclu-

---

181). Although the population of Micronesia is characterized by significant diversity, "[t]he peoples of all of these islands are ethnically linked, and trace their ancestry to migrations from Asia." S.Rep. No. 433, 94th Cong., 1st Sess. 23 (1975).

sively to accomplish the objective of Article X of such Agreement and only as a clarification of the effect of Article X, and are not to be construed or implemented separately from Article X.

Pub.L. No. 99–239, 99 Stat. 1770, 1782 (1986) (App. I at 101). This language is hardly free from ambiguity. On the one hand, the Senate clearly rejected other wording, originally contained in the House bill, which would have stated unequivocally that the jurisdiction-stripping provisions would apply only if the espousal were held to be valid.[7] On the other hand, the Congress did not simply eliminate all references to the interdependence of the jurisdictional and espousal provisions—as would seem to be the most logical course of action if the withdrawal of jurisdiction were intended to stand alone. Instead House and Senate leaders accepted compromise language which gave complete satisfaction to no one. It is therefore not too surprising that the words of the statute fail to resolve this question unambiguously.

What is most striking, in my view, is the failure of either the majority or the government to suggest a plausible *alternative* reading of § 103(g)(2). The majority suggests that "[t]he language of Section 103(g)(2) upon which plaintiffs rely simply makes it plain that the deprivation of jurisdiction applies not to all claims by the Marshall Islanders against the United States, but only those described in Articles X and XI of the Section 177 Agreement. Presumably, any other claim, under the Federal Tort Claims Act or other authority,

could proceed." Maj. op. at 375–76. With respect, this seems to me most unlikely. Article XII provides that "[a]ll claims described in Articles X and XI of this Agreement shall be terminated. No court of the United States shall have jurisdiction to entertain such claims, and any such claims pending in the courts of the United States shall be dismissed." Even in the absence of § 103(g)(2), I do not see how this language could possibly suggest that consent to suit was withdrawn as to claims other than those described in Articles X and XI.[8] The majority's interpretation of § 103(g)(2) would render that section entirely superfluous. The same may be said of the government's contention that § 103(g)(2) "simply confirms that [Articles X and XII] are to be implemented together, as already required by the terms of the Agreement itself." Brief for United States at 16. It is hard to see what legal force can attach to a requirement that two provisions must be "implemented together," unless the applicability of one is contingent upon the lawfulness of the other.

Section 103(g)(2) is assuredly not the most straight-forward way of saying that the withdrawal of federal jurisdiction was contingent upon judicial validation of the espousal provisions. But I fail to see what else § 103(g)(2) could mean. Rather than assume that this section is a nullity—that it either says nothing at all or else repeats what is already clear from other portions of the statute—I would read this language to provide that a valid espousal is a neces-

---

7. Section 5(n)(2) of the House bill provided that: "If, notwithstanding the enactment into law of this Act, a United States court of competent jurisdiction determines that the provisions of Article X of the Agreement ... are invalid as a matter of international law or for any other reason, the provisions of Article XII of the Section 177 Agreement shall not, of themselves, prevent any court of the United States otherwise having jurisdiction over claims described in Article X and XI of the Section 177 Agreement from entertaining such claims; and the time between the effective date of the Compact and any subsequent final determination of invalidity of Article X of the Section 177 Agreement shall not be included in any calculation regarding applicable statutes of limitations or other similar limitations pertaining to the presentation of any such claims to any such court." *Reprinted*

*in* H.R.Rep. No. 188, Part 2, 99th Cong., 1st Sess. 79 (1985), U.S.Code Cong. & Admin.News 1985, p. 2746 (App. I at 411).

8. Section 103(g)(1) of the Act states: "It is the intention of the Congress of the United States that the provisions of section 177 of the Compact of Free Association ... constitute a full and final settlement of all claims described in Articles X and XI of the Section 177 Agreement, and that any such claims be terminated and barred except insofar as provided for in the Section 177 Agreement." 99 Stat. 1782 (App. I at 101). It seems to me that the statute, like the Agreement, quite clearly restricts the withdrawal of jurisdiction to the claims described in Articles X and XI.

sary precondition for the abrogation of judicial relief. My preference for this reading is of course supported by my view that withdrawal of jurisdiction, standing alone, would raise a substantial constitutional question.

### C. *Legislative History*

The legislative history offers only slight assistance in resolving the interpretive questions at issue here. Unlike the majority, however, I believe that this history supports rather than undermines the plaintiff's position.

The plaintiffs rely heavily on the following statement of Representative Seiberling:

[Section 103(g)(2) ] is intended to make it clear that court-stripping provisions of article XII of the section 177 agreement have no independent force or effect and their sole function is to implement the provisions of article X. Thus, if article X is valid, espousal stands; and if article X is invalid, claims covered by the espousal provisions will remain justiciable in U.S. courts, regardless of article XII.

131 Cong.Rec. H11,829 (daily ed. Dec. 11, 1985) (App. II at 609).[9] This statement is of somewhat doubtful authority: as the government points out, it was not spoken on the floor during debate but was inserted into the text subsequently under permission to extend remarks. *See* Brief for United States at 19. Representative Seiberling did, however, state during floor debate that "the provisions of the compact regarding espousal of the Marshall Islands' claims are subject to judicial review like any act of Congress," 131 Cong.Rec. H11,-838 (daily ed. Dec. 11, 1985) (App. II at 618), and that statement went uncontradicted.[10]

The statements of a single Representative constitute pretty scanty evidence, but the government has offered little in response. The government and the majority rely heavily on statements to the effect that the Compact was intended to provide a comprehensive settlement of tort claims stemming from American nuclear testing in Micronesia. Representative Solarz, a sponsor of the Act, stated that "the compact settles all nuclear claims resulting from our nuclear weapons testing program." 131 Cong.Rec. H11,836 (daily ed. Dec. 11, 1985) (App. II at 616). The section-by-section analysis of the Compact Act stated that § 103(g) "reiterates the provisions of Section 177 of the Compact which provides that there is full and final settlement of all nuclear effects claims." 131 Cong.Rec. S17,651 (daily ed. Dec. 13, 1985) (App. II at 621). Both the government and the majority view these statements as evincing a congressional intention to shield the espousal provisions from judicial review. *See* Brief for United States at 20; Maj. op. at 377.

In my view this is an unconvincing argument. If Congress enacted legislation dealing with a knotty banking problem (for example), and if the relevant committee reports described the statute as a "final settlement" or "comprehensive solution" to the problem, no one would suppose that Congress thereby intended to preclude judicial review. In the present case, a Congressperson who believed that the espousal provisions were judicially reviewable, but that they would ultimately be upheld in court, might very easily state that the Compact would constitute a "full and final settlement." In fact, Representative Lagomarsino—a supporter of the Compact Act on whose views the government relies, *see* Brief for United States at 20–21—expressed essentially this view:

**9.** Representative Seiberling also stated: "The House bill also included language specifying that should article X of the section 177 subsidiary agreement be held invalid, article XII of that agreement would have no effect; while this language has been somewhat revised, the new revision is to the same effect." 131 Cong.Rec. H11,829 (daily ed. Dec. 11, 1985) (App. II at 609).

**10.** The Congressman went on to say that "a legacy of the unique relationship of the United States to the Marshall Islanders under the U.N. trusteeship agreement will be the pending constitutional questions with respect to their rights, questions which cannot be foreclosed from court review." 131 Cong.Rec. H11,838 (daily ed. Dec. 11, 1985) (App. II at 618).

If the section 177 agreement is challenged in the courts, it is the view of the Department of Justice and the Department of State, whose representatives testified on the section 177 agreement during our hearings on the compact, that the United States will prevail and that the constitutionality of this agreement will be affirmed.

132 Cong.Rec. 520 (January 23, 1986) (extension of remarks) (App. II at 624). In short, I see no conflict between Representative Solarz's view that "the compact settles all nuclear claims" and Representative Seiberling's assurance that the espousal provisions "are subject to judicial review like any act of Congress." It is surely the norm that Congress, when it passes legislation, will expect both that the new statute will be challenged in court, and that the law will survive judicial review and thereafter fulfill its stated purpose.

Finally, I think that the plaintiffs' position is supported by the logic of the situation. This is not a case in which Congress first decided to strip the courts of jurisdiction and then looked around to see what might be done to lessen the hardship of the Marshall Islanders. Rather, the espousal and jurisdiction-stripping provisions appear to have been regarded throughout the process as integrally connected. Given this background, it is hard to imagine that Congress would have wished the jurisdiction-stripping provisions to take effect even if the espousal provisions were invalidated.[11]

The majority concludes that the withdrawal of jurisdiction over these claims should be viewed as standing alone, and should be affirmed on this basis. In light of the serious constitutional difficulties that would attend such a selective denial of judicial relief, I would hesitate to interpret the statute in that way if another plausible reading is available. In my view, both the language and the history of the Compact Act support the plaintiffs' contention that

their suit for damages should be dismissed only if the espousal is found to be valid.

## II. DOES THE VALIDITY OF THE ESPOUSAL PRESENT A POLITICAL QUESTION?

Judge Sentelle also states that "even if we err in our interpretation of [the Compact] Act ... the District Court was without jurisdiction over this matter of international relations by reason of the political question doctrine." Sentelle opinion (Sentelle op.) at 379. My colleague does not, however, follow through with the implications of that statement. For if Judge Sentelle has erred in his interpretation of the Compact Act, then Congress has in fact provided by statute that the validity of the jurisdiction-stripping provisions is to be contingent on a judicial assessment of the espousal. The political question doctrine can furnish a true alternative rationale only if my colleague is willing to say that judicial intervention in this area is constitutionally forbidden *even if* Congress has invited the courts to play a role. If we assume that the Compact Act provides for judicial review of the espousal, then judicial review is not, in my view, an untoward intrusion into the political branches' negotiation of international agreements. Rather, the courts, by reviewing the espousal, would (as plaintiffs' counsel put it at oral argument) simply be enforcing the agreement according to its terms.

Leaving that point aside, I believe that Judge Sentelle's political question analysis is deeply flawed. My colleague appears to assert two distinct bases for finding this to be a political question: (1) that the issues presented are unsuitable for judicial resolution; and (2) that the political branches' conduct of foreign policy would be undermined if the court were to review the espousal. The first argument rests on a misunderstanding of the plaintiffs' claims; the

---

11. The interpretive problem posed here might be characterized as a question concerning the severability of statutory provisions. To give independent effect to the jurisdiction-stripping language, we must conclude both that this provision would be constitutional in isolation, and

that Congress would have wished to withdraw federal jurisdiction even if the espousal were deemed invalid. *See Lynch, supra,* 292 U.S. at 586, 54 S.Ct. at 846. Both of these propositions are in my view quite doubtful.

second rests on a misconception of the political question doctrine.

### A. Suitability of the Issues for Judicial Resolution

If the plaintiffs were attacking the espousal on the ground that the purported government of the Marshall Islands was not truly sovereign, then I would agree that a political question had been posed. Plaintiffs, however, have expressly disavowed such a challenge. *See* Brief for Appellants at 12. As I discuss at greater length *infra*, I also believe that any challenge to the adequacy of the settlement is nonjusticiable. Plaintiffs' central contention, however, is that the espousal is invalid because international law forbids the espousal of claims held by persons who were not nationals of the espousing state at the time the claims arose. That issue seems to me entirely suitable for judicial resolution.

To accept the plaintiffs' argument, we must accept three distinct propositions: (1) that the withdrawal of jurisdiction is contingent on the validity of the espousal; (2) that the espousal is invalid as a matter of domestic law if it contravenes international law; and (3) that under international law a state may espouse only the claims of individuals who were its nationals when the claims arose. My colleague may disagree with each of these propositions, but I cannot fathom how any one of them could be deemed unfit for judicial resolution. Each is a pure question of law which requires no foreign policy expertise and implicates no uniquely political concerns.

### B. Interference With the Political Branches

My colleague also argues that this issue raises a political question because, by undermining the relationship between the governments of the United States and the Marshall Islands, it may interfere with the political branches' conduct of foreign relations. This argument, in my view, sweeps much too broadly. In *Baker v. Carr*, 369 U.S. 186, 211, 82 S.Ct. 691, 706–07, 7 L.Ed. 2d 663 (1962), the Supreme Court cautioned that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." More recently, the Court reaffirmed, in a case with a potentially substantial impact on foreign relations, that "the courts have the authority to construe treaties and executive agreements, and it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts.... [U]nder the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones." *Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1986).

There exists, in fact, a long line of Supreme Court cases resolving on the merits legal issues with highly significant implications for foreign affairs. In *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 590–91, 72 S.Ct. 863, 868–69, 96 L.Ed. 1153 (1952), the Court invalidated President Truman's seizure, pursuant to his authority as Commander-in-Chief during the Korean War, of private steel mills to avert a nationwide strike which the President asserted would "immediately jeopardize and imperil our national defense and the defense of those joined with us in resisting aggression, and would add to the continuing danger of our soldiers, sailors, and airmen engaged in combat." In *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the Court enforced a subpoena of Presidential documents, although a foreseeable result of its decision was a diminution of Presidential prestige and authority, with obvious ramifications for American foreign policy. In *Japan Whaling Association, supra*, the Court considered and rejected the government's contention that the political question doctrine barred judicial resolution of a challenge to the Commerce Secretary's decision not to certify Japan for its violation of whale-harvesting rules. The closest parallel to the present case would appear to be *Dames & Moore v. Regan*, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), which involved a challenge to the Iran claims

settlement. A decision adverse to the government would plainly have had far-reaching effects on U.S. foreign policy: it would have infuriated Iran by abrogating the settlement, and it would have demonstrably tied the President's hands in dealing with similar crises in the future. The Court nevertheless resolved the dispute on the merits; I believe that the present case is also justiciable.

The central principle, cited but (in my view) misconstrued by my colleague, is that "[t]he doctrine of which we treat is one of 'political questions,' not one of 'political cases.'" *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. at 710. I read this passage as a reminder that our focus should be on the particular issue presented for our consideration, not the ancillary effects which our decision may have on political actors. If we are called upon to resolve a question (such as the identity of a foreign state's legitimate ruler) which courts are ill-qualified to decide, then invocation of the political question doctrine is appropriate. But when the issue is well-suited for judicial resolution (as is surely the case with the purely legal questions presented here), then we should not decline to adjudicate simply because the impact of our ruling cannot be cabined within a wholly apolitical realm.

### III. Is the Espousal Valid?

Having concluded that the jurisdiction-stripping provisions of the Compact Act are contingent upon the validity of the espousal, and that the plaintiffs' central challenge to the espousal is justiciable, I proceed to the merits of the plaintiffs' challenge. Plaintiffs assert three distinct attacks on the espousal provisions of the Compact Act.

### A. *Adequacy of the Settlement*

The plaintiffs assert that the espousal should be invalidated because the amount of the settlement—$150 million—is inadequate in comparison to the injuries that they have suffered. They invoke concepts of trusteeship and fiduciary duty in arguing that the United States Government owes a continuing obligation to the residents of the Marshall Islands. In my view, however, this court is precluded from inquiring into the adequacy of the settlement.[12]

Whatever the prior relationship between the United States Government and the people of the Marshall Islands, under the Compact it is the Marshall Islands Government which must protect the interests of its residents. Once we acknowledge the power of the Marshall Islands Government to espouse these claims, then any dispute as to the adequacy of the settlement must be recognized as in substance a dispute between the plaintiffs and their own government. Such a dispute would seem to lie beyond the purview of this court, both because this court lacks the authority to inquire into the adequacy of another government's representation of its own people, and because the United States Government cannot in any event be held responsible for another government's failings. Nor is this transformed into a claim against the United States by the contention that the United States Government has "coerced" a favorable settlement. The American Government, after all, typically bargains from a position of strength; and I see no basis on which this court could scrutinize international agreements and inquire into the ade-

12. Congress, it might be noted, has been quite inconsistent in its defense of the settlement figure. The report of the House Committee on Foreign Affairs stated that "[t]he compact is also very much in the economic interests of the United States.... At the present time, there are approximately $5 billion in nuclear claims suits pending against the U.S. Government. Without the settlement contained in the compact, these suits will proceed, and it is quite possible that adverse decisions will be handed down against the U.S. Government that will cost it, and thus the taxpayer, considerably more than $150 million." H.R.Rep. No. 188, Part 1, 99th Cong., 1st Sess. 5 (1985) U.S.Code Cong. & Admin.News 1985, pp. 2746, 2750 (App. I at 183). Later in the same document, the Committee defended the settlement on the ground that "it is entirely possible that if there were no settlement in the compact and all the court cases proceeded to decisions, that the people on the four atolls might receive less than the $150 million we have agreed to provide as a settlement." *Id.* at 9–10 (App. I at 188).

quacy of the consideration given to foreign states.

Moreover, any inquiry into the adequacy of the settlement figure would require, in essence, that the district court try the lawsuit. The adequacy of the settlement, after all, depends both on the extent of the plaintiffs' injuries—a very difficult determination in itself[13]—and on the likelihood of their collecting a judgment in the face of the government's formidable defenses.[14] The whole point of the espousal, however, was to achieve expeditious settlement of these claims and avoid protracted litigation. I believe that Congress did intend for the withdrawal of federal jurisdiction over the tort claims to be contingent on the validity of the espousal. But it would seem to me a bizarre result if we could uphold the espousal only after completing the sort of extended inquiry which the settlement was designed to prevent.

## B. *Takings Claim*

The plaintiffs also contend that the espousal is invalid because it constitutes a taking of property without just compensation, and thus violates the fifth amendment.[15] This claim fails on two grounds. First, it ignores the Supreme Court's admonition that "consent to sue the United States is a privilege accorded; not the

grant of a property right protected by the Fifth Amendment." *Lynch v. United States*, 292 U.S. 571, 581, 54 S.Ct. 840, 844, 78 L.Ed. 1434 (1934). Moreover, the fifth amendment does not prohibit all takings, but only takings for which "just compensation" has not been paid. The compensation provided by the international agreement is presumptively just; for reasons noted earlier, this court is precluded from inquiring into the adequacy of the settlement.

## C. *International Law Claim*

The plaintiffs' principal claim is that the espousal provisions violate international law because the individuals whose claims were settled were not nationals of the Marshall Islands at the time the injuries occurred.[16] This line of argument requires the plaintiffs to establish both that the espousal is invalid as a matter of domestic law if it violates international law, and that international law in fact forbids this sort of espousal agreement. The plaintiffs would appear to face a formidable obstacle in this court's recent decision in *Committee of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929 (D.C.Cir.1988). The court there considered the question whether a federal statute could be invalidated on the ground that it violates customary international law.[17] The panel concluded that

**13.** As the government's brief points out, "plaintiffs would be required to individually prove *specific injuries caused by exposure to radiation.* This burden of proof would be made more difficult here by the problems of distance, language, and illiteracy encountered in communicating with thousands of plaintiffs scattered across hundreds of miles throughout the islands." Brief for United States at 25 n. 14.

**14.** Plaintiffs in these suits "would face a multitude of jurisdictional defenses, including the discretionary function exception (28 U.S.C. 2680(a)), the foreign claims exception (28 U.S.C. 2680(k)), the statute of limitations (28 U.S.C. 2401(b)), and the administrative claim requirement (28 U.S.C. 2675(a))." Brief for United States at 25 n. 14.

**15.** This takings claim should be distinguished from the takings claim at issue in *People of Enewetak v. United States*, 864 F.2d 134 (Fed. Cir.1988). Plaintiffs in that case argued that the damage wrought by U.S. nuclear testing was itself a taking of property in violation of the

fifth amendment. The property allegedly taken was plaintiffs' lands, homes, and businesses. Here the plaintiffs' cause of action is a tort claim under the Federal Tort Claims Act. Plaintiffs respond to the government's defense (lack of jurisdiction) by arguing that a withdrawal of jurisdiction would constitute an uncompensated taking; the property allegedly taken here is the plaintiffs' cause of action in tort.

**16.** The broadest form of the rule on nationality of claims is the continuous nationality rule, which requires that a claim be held continuously by a national of the espousing state from the time of the injury to the time of the espousal.

**17.** The court in *Nicaragua* distinguished between "customary" and "peremptory" norms of international law, and left open the possibility that "peremptory" norms might supersede domestic law. "Peremptory" norms are those principles of international law deemed so fundamental that no deviation from them is permitted. The *Nicaragua* court cited "genocide, slavery, murder, torture, prolonged arbitrary deten-

"the law in this court remains clear: no enactment of Congress can be challenged on the ground that it violates customary international law." 859 F.2d at 939. It therefore might appear that, even if the withdrawal of jurisdiction is contingent on the validity of the espousal, the espousal cannot be deemed invalid on the basis of its alleged incompatibility with international law. In response, the plaintiffs offer two closely related arguments in support of their contention that international legal norms should be controlling here.

The first argument is based on congressional intent. Plaintiffs appear to concede that Congress may, if it wishes, pass a statute which contravenes customary international law, and that federal courts in such a circumstance are obliged to give effect to the statute. But in plaintiffs' view Congress, by negotiating an international agreement in accordance with international legal processes, and by using the technical term "espousal," has signaled its intention that the Compact Act should be reviewed on the basis of international law. Thus, plaintiffs do not argue that customary international law can *supersede* the will of Congress; they simply contend that application of international law is essential to a proper construction of the Compact Act.

In advocating this interpretation of the statute, the plaintiffs rely on the Supreme Court's recent statement that "[i]t has been a maxim of statutory construction since the decision in *Murray v. The Charming Betsy*, 2 Cranch 64, 118, 2 L.Ed. 208 (1804), that 'an act of congress ought never to be construed to violate the law of nations, if any other possible construction remains....'" *Weinberger v. Rossi*, 456 U.S. 25, 32, 102 S.Ct. 1510, 1516, 71 L.Ed.2d 715 (1982). If congressional intent regarding the applicability of international legal norms is ambiguous, plaintiffs argue, then the court should assume that international law is to govern. The court should not, in other words, in the absence of clear evidence presume that Congress would wish for domestic legal consequences to follow from an international agreement which is itself violative of international law.

In the end, though, I think it is unnecessary to determine whether international law applies, because in my view the espousal does not violate international law. The plaintiffs are correct in stating that espousal agreements are typically limited to the settlement of claims held by persons who were nationals of the espousing country at the time the claims arose. But I think the government is correct in arguing that this is a matter of custom rather than a binding rule, and that no international legal norm forbids countries from agreeing to the espousal of claims held by individuals who do not meet the strictures of the continuous nationality rule. *See, e.g.,* 1 G. Schwarzenberger, *International Law* 594 (3d ed. 1957) (App. II at 767) ("Like any other rule of international customary law, the rule on the nationality of claims may be modified or abrogated by means of treaties."). *See also* 1 R. Lillich and B. Weston, *International Claims: Their Settlement by Lump Sum Agreements* 48–50 (1975) (App. II at 742–43).

An understanding of the reason for the general custom shows why it is of no help to the plaintiffs in this case. General acceptance of the continuous nationality rule is a principle of relations *between nations*. It prevents one nation from exerting undue pressure on another by espousing the claims of individuals to whom it bears only a tenuous relationship. It also removes incentives for individuals to change nationality in order to gain the assistance of a powerful state. Neither of these concerns is implicated in the present case. Rather, plaintiffs' quarrel with the espousal is at bottom a quarrel with their own government. But the rule concerning the nationality of claims—like international law gen-

tion, and racial discrimination" as examples of peremptory norms. 859 F.2d at 941. Plaintiffs here do not contend that the espousal violates a peremptory norm of international law. Nor do I believe that such a claim would be tenable:

although the jurisdiction-stripping provisions of the Compact Act, standing alone, might raise concerns about racial bias, the espousal viewed in its entirety cannot plausibly be portrayed as an instrument of racial discrimination.

erally—was never intended to be a measure for limiting the authority of a government vis-a-vis its own nationals.[18] These plaintiffs are seeking in essence to invoke a rule of international law as a basis for challenging their own government's power to settle their claims. I do not believe, though, that international law in any way forbids the agreement reached here.

### IV. CONCLUSION

Although I, like my colleagues, conclude that the district court lacked jurisdiction to address the plaintiffs' claim for damages under the FTCA, the difference between my approach and theirs seems to me sufficiently important to justify a separate opinion. Despite the broad dictum in some Supreme Court decisions, I am troubled by the majority's uncritical assumption that Congress may deprive a narrow class of plaintiffs of judicial relief, even if their claims are nonconstitutional. The interplay between the very broad congressional control over federal jurisdiction (particularly in the context of damage suits against the United States), and the fundamental requirement that access to the federal courts must be granted on a nondiscriminatory basis, would seem to me to pose a difficult constitutional question. I hesitate to address this question absent clear evidence that Congress did in fact intend to effect an unconditional withdrawal of jurisdiction.

In my view, no such evidence is present in this case. Rather, it appears to me that the jurisdiction-stripping and espousal provisions of the Compact Act were consistently thought of as parts of a package. Congress did not seriously consider enacting one without the other, and it seems artificial to review the withdrawal of jurisdiction as though it stood in isolation. I believe that Congress intended that the withdrawal of jurisdiction should be contingent on judicial approval of the espousal mechanism. However, because I find no infirmity in the espousal, I conclude that the withdrawal of federal jurisdiction was valid and that the plaintiffs' claims for damages were properly dismissed.

---

**18.** In certain limited areas, international law does restrict the authority of governments over their own people. *See, e.g., Filartiga v. Pena-Irala,* 630 F.2d 876, 884 (2d Cir.1980) ("[O]fficial torture is now prohibited by the law of nations. The prohibition is clear and unambiguous, and admits of no distinction between treatment of aliens and citizens."). These restrictions, however, are extraordinary; international law plainly imposes no generalized "duty of fair representation" on any government.