Olivier BANCOULT et al., Plaintiffs,

v.

Robert S. McNAMARA
et al., Defendants.

Civil Action No. 01–2629 (RMU).

United States District Court,
District of Columbia.

Dec. 21, 2004.

Michael E. Tigar, Washington, DC, for Plaintiffs.

Richard Montague, Elaine Marzetta Lacy, John David Taurman, Michael R. Charness, Cynthia T. Andreason, Washington, DC, for Defendants.

## *MEMORANDUM OPINION*

URBINA, District Judge.

GRANTING THE INDIVIDUAL DEFENDANTS' MOTION TO DISMISS; GRANTING THE DEFENDANT UNITED STATES' MOTION TO DISMISS; AND DENYING THE PLAINTIFF'S SECOND MOTION FOR A PRELIMINARY INJUNCTION

### I.  INTRODUCTION

In the middle of the Indian Ocean and at the heart of this action lies the Chagos Archipelago ("Chagos"), a grouping of 52 islands administered by the British government and leased to the United States under the British Indian Ocean Territory Agreement ("BIOT Agreement").  During the late 1960s and early 1970s, the Chagos population was forcibly removed to nearby Mauritius and Seychelles to make way for a U.S. military facility.  The plaintiffs in

this case are persons indigenous to Chagos, their survivors or direct descendants, and organizations interested in the betterment of the Chagossian community. They bring this action against the United States and various current and former officials of the Department of State and the Department of Defense[1] ("the individual defendants") for forced relocation, torture, racial discrimination, cruel, inhuman, and degrading treatment, genocide, intentional infliction of emotional distress, negligence, and trespass.

The individual defendants move to dismiss the complaint based on the statutory immunity granted to federal officers under the Federal Employee Liability Reform and Tort Compensation Act ("Westfall Act"), lack of subject-matter jurisdiction based on the political question doctrine, and on statute of limitation grounds. The United States moves to dismiss the complaint for lack of subject-matter jurisdiction based on sovereign immunity, the political question doctrine and lack of standing. The plaintiffs oppose these motions and move to strike the United States Attorney General's certification that the individual defendants were acting within the scope of their employment at the time of the alleged incidents. Also pending before the court is the plaintiff's second motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a), which seeks to enjoin the United States from denying the plaintiffs' request for a limited visit to Chagos.

Because the plaintiffs fail to rebut the Attorney General's certification that the individual defendants acted within their scope of employment when the events complained of took place, the court finds that the individual defendants are immune from suit under the Westfall Act and grants their motion to dismiss. As a result, the United States is substituted as the sole defendant. Because this suit raises nonjusticiable political questions and thus precludes this court's review, the court also grants the defendant United States' motion to dismiss. The court's order granting the individual defendants' and the United States' motions to dismiss renders the plaintiffs' second motion for a preliminary injunction moot. Accordingly, the court denies the plaintiffs' second motion for a preliminary injunction.

## II. BACKGROUND

### A. Factual Background[2]

Chagos is a grouping of small islands in the middle of the Indian Ocean, at least 1,000 miles away from the nearest landmasses of India, Mauritius, Australia, and the Gulf States.2d Am. Compl. ¶ 10. Chagos includes the islands of Diego Garcia, Peros Banhos, Salomon, and numerous other small islands. *Id.* ¶ 8. Ceded to the United Kingdom by the French in 1814, Chagos became part of the British colony of Mauritius, and continues under British administration today. *Id.* ¶¶ 9–10. Its population, which numbered more than 550 in 1861, grew to approximately 1,000 inhabitants by the 1960s. *Id.* ¶¶ 8, 10. For

---

1. The individual defendants are: Donald H. Rumsfeld, Robert S. McNamara, Melvin R. Laird, James R. Schlessinger, Thomas Morrer, James L. Holloway, Eric D. Newsom, George T. Churchill.

2. The facts are taken from the plaintiff's second amended complaint and the 1975 Congressional debates over the military base on Diego Garcia and the island's former inhabitants. While the defendants do not entirely dispute these facts, the court assumes that these facts are true for the purpose of ruling on the instant motions. *See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

over a century, the Chagossians established communities by working at the local copra (coconut product) plantations, cultivating vegetables, raising animals, attending church, burying their dead, educating their children, and otherwise engaging in community life. *Id.* ¶ 11.

The plaintiffs allege that in 1964, the British and the United States governments entered into secret negotiations to establish a United States military facility in the Indian Ocean. *Id.* ¶ 17. According to the plaintiffs, the two governments conducted a survey and concluded that the construction of a military base in Diego Garcia would require the displacement of the entire indigenous population living in the island. *Id.* In 1965, at the request of the United States, the British government split Chagos from Mauritius before the latter became independent from Britain and incorporated the islands into the newly formed British Indian Ocean Territory ("BIOT"). *Id.* ¶ 9. The plaintiffs allege that between 1965 and 1973, the defendants and/or their agents forcibly removed, in stages, the Chagos population to Mauritius and Seychelles. *Id.* ¶¶ 21–23. During the first stage, the defendants and/or their agents blocked the plaintiffs' return to Chagos after travel outside the archipelago. *Id.* ¶ 22(a). In the second stage, the defendants imposed an embargo restricting the flow of food supplies to Chagos. *Id.* ¶ 22(b). Finally, the defendants and/or their agents physically corralled the population remaining on Diego Garcia and boarded them on overcrowded ships for Peros Banhos and Salomon, from whence they eventually were taken to Mauritius and Seychelles. *Id.* ¶¶ 22(c)–23. Diego Garcia, the largest of the Chagos islands, then became home to the proposed U.S. military facility. *Id.* ¶ 25.

In June of 1975, Congress debated the undergoing construction of a military facility on Diego Garcia. *See generally Diego Garcia, 1975; The Debate Over the Base and the Island's Former Inhabitants: Hearings Before the Special Subcommittee on Investigations of the Committee on International Relations of the House of Representatives,* 94th Cong., 1st Sess. 1–123 (1975) (hereinafter "The 1975 Congressional Debate Over Diego Garcia"). Congress met again on November 4, 1975, to address the removal of the Chagossian population from the Archipelago. *Id.* at 37–81. Members of Congress voiced harsh criticism at representatives from the Executive branch for not providing assistance to the Chagossian population and leaving those arrangements to the British and Mauritian governments. *Id.* at 46, 66, 68, 71. Notwithstanding the revelations made during these hearings, Congress appropriated funds to support the construction of a military base on Diego Garcia.

The plaintiffs in this action are three individuals and two organizations. Plaintiff Bancoult is a native Chagossian who alleges that in 1967, his family was prevented from returning home to Peros Banhos after a medical visit to Mauritius. *Id.* ¶ 31. Plaintiff Bancoult alleges that he and his family did not receive any relocation assistance and therefore suffered abject poverty in Mauritius. *Id.* Plaintiff Bancoult also alleges that he has been rejected repeatedly for employment on Diego Garcia. *Id.* Plaintiff Alexis is a native of Diego Garcia, who reports that in 1971 and 1972, persons acting on behalf of the U.S. and Britain forced her family and others to board a vessel from Diego Garcia to Peros Banhos and later, to Seychelles. *Id.* ¶ 32. She alleges that the harsh conditions of passage caused her pregnant mother to miscarry. *Id.* Plaintiff France–Charlot was born in Mauritius and is a first-generation descendant of Chagossians native to Salomon Island. *Id.* ¶ 33. She alleges that as a result of the poverty her family endured in Mauritius, she suffered

social, cultural, and economic oppression. *Id.* Plaintiffs Chagos Refugee Group and the Chagossian Committee (Seychelles) are organizations whose principal interest is the betterment of the Chagossian community in, respectively, Mauritius (including Agalega) and Seychelles. *Id.* ¶¶ 34–35.

### B. Procedural History

In December 2001, the plaintiffs filed a complaint against the United States, the individual defendants, Halliburton, and a Mauritian company named De Chazal Du Mée & Cie ("DCDM"). A few months later, the plaintiffs moved for a preliminary injunction to bar the United States and DCDM from engaging in alleged employment discriminatory policies and practices. The United States, the individual defendants, and DCDM responded by filing motions to dismiss, while Halliburton responded with a motion to dismiss and for summary judgment. In September 2002, the court issued a memorandum opinion denying the plaintiffs' motion for a preliminary injunction, ordering further briefing on the United States' motion to dismiss for lack of subject-matter jurisdiction, and granting DCDM's motion to dismiss for ineffective service of process. *Bancoult v. McNamara,* 227 F.Supp.2d 144 (D.D.C. 2002). In response to the court's order directing the plaintiffs to clarify their claims against the United States, the plaintiffs filed a supplemental memorandum stating that: (1) they base their claims on customary international law [3] and the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350; (2) they seek declaratory relief, injunctive relief, and restitution; (3) the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.,* provides a waiver of sovereign immunity; and (4) no waiver of sovereign immunity is necessary for violations of *jus cogens* norms.[4] Pls.' Supp. Br. at 1–14.

In November 2002, the plaintiffs moved for leave to amend their complaint to reinstate DCDM and add Brown & Root as defendants. The court issued a memorandum opinion granting the plaintiffs' motion with regard to the United States, the individual defendants, Halliburton, and Brown & Root, and denying the plaintiffs' motion with regard to DCDM. *Bancoult v. McNamara,* 214 F.R.D. 5 (D.D.C.2003). After the plaintiffs filed their first amended complaint, all defendants renewed their respective motions. In response to the Halliburton and Brown & Root motions to dismiss and for summary judgment, the plaintiffs moved to permit discovery pursuant to Federal Rule of Civil Procedure 56(f).

In September 2003, the court denied the plaintiffs' motion to permit discovery and the plaintiffs' motion to enlarge time and set a revised briefing schedule. *Bancoult v. McNamara,* 217 F.R.D. 280 (D.D.C. 2003). Subsequently, however, the plaintiffs moved to dismiss Halliburton and Brown & Root in light of "[r]ecent events occurring in parallel litigation in the United Kingdom." Pls.' Mot. to Dismiss at 1. The court granted the plaintiffs' motion. Minute Order dated Dec. 3, 2003. As a result of these actions, the United States

---

3. Customary international law (also known as the law of nations) arises from the customs and usages of civilized nations. *Comm. of U.S. Citizens Living in Nicaragua. v. Reagan,* 859 F.2d 929, 940 (D.C.Cir.1988); *Sanchez–Espinoza v. Reagan,* 770 F.2d 202, 206 (D.C.Cir.1985).

4. "A *jus cogens* norm is a principle of international law that is 'accepted by the international community of States as a whole as a norm

from which no derogation is permitted[.]' " *Princz v. F.R.G.,* 26 F.3d 1166, 1173 (D.C.Cir. 1994) (citing *Comm. of U.S. Citizens Living in Nicaragua,* 859 F.2d at 940). "*Jus cogens* norms are a select and narrow subset of the norms recognized as customary international law." *Id.* at 1180 (Wald, J. dissenting) (citing *Comm. of U.S. Citizens Living in Nicaragua,* 859 F.2d at 940–41).

and the individual defendants are the sole remaining defendants in the case.

On September 12, 2003, the plaintiffs filed a second motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a). In their second preliminary injunction, the plaintiffs seek to enjoin the United States from denying the plaintiffs' request for a limited visit to Chagos. Pls.' 2d Mot. for Prelim. Inj. at 1. In November 2003, the plaintiffs sought leave from the court to again amend their complaint to substitute a recently deceased plaintiff, Therese Mein, with her daughter, Jeanette Therese Alexis. The court granted the plaintiffs' motion for leave to amend their complaint. Minute Order dated Nov. 18, 2003.

On January 23, 2004, the plaintiffs moved the court to stay the case pending the Supreme Court decision in *Sosa v. Alvarez–Machain,* 542 U.S. 296, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). With the consent of both parties, the court granted the plaintiffs' request and stayed the case until the Supreme Court issued an opinion in *Sosa.* Order dated Mar. 26, 2004. On October 19, 2004, the court lifted the stay and directed the parties to submit further briefing regarding the impact of *Sosa* on the instant case. After issuing this order, the court reactivated all pending motions. The court now turns to the motions currently pending before it: the individual defendants' motion to dismiss, the United States' motion to dismiss, and the plaintiffs' second motion for a preliminary injunction.

### III. ANALYSIS

#### A. The Individual Defendants' Motion to Dismiss

#### 1. Legal Standard for Immunity of Federal Officers Under the Westfall Act

The Federal Employees Liability Reform and Tort Compensation Act ("Westfall Act") generally confers upon all federal officers and employees immunity for their "negligent or wrongful act[s] or omission[s]" while acting within the scope of their office or employment. *See* Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub.L. No. 100–694, 102 Stat. 4563 (1988) (codified at 28 U.S.C. §§ 2671–2680); *United States v. Smith,* 499 U.S. 160, 163, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991). The statute further provides:

> Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1). In a case where the Attorney General, or by designation the United States Attorney in the district where the claim is brought, has filed a certification that the original defendant was acting within the scope of his employment, such certification has the following consequences: (1) if the suit originated in state court, then the Attorney General or his designee is required to remove it to federal court; (2) the United States shall be substituted as the sole defendant; or (3) if the suit is not originally pursuant to the Federal Tort Claims Act (FTCA), then the suit is converted to one against the United States under the FTCA. 28 U.S.C. § 2679(d)(2); 28 C.F.R. § 15.3(a) (2002); *Haddon v. United States,* 68 F.3d 1420, 1423 (D.C.Cir.1995). The certification is conclusive for purposes of removal; how-

ever, the substitution and conversion consequences are subject to judicial review, that is, they are contingent on whether the court finds that the original defendant acted within the scope of his employment. *See Gutierrez de Martinez v. Lamagno,* 515 U.S. 417, 434, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995) (stating that "the Attorney General's certification that a federal employee was acting within the scope of his employment ... does not conclusively establish as correct the substitution of the United States as defendant in place of the employee"); *Haddon,* 68 F.3d at 1423 (noting that "the federal court may independently determine whether the employee acted within the scope of employment and, therefore, whether to substitute the federal government as the proper defendant").

■ When the court reviews the validity of a certification filed by the Attorney General, the certification is entitled to "prima facie effect" that the defendants acted within the scope of their employment. *Kimbro v. Velten,* 30 F.3d 1501, 1509 (D.C.Cir.1994) (internal citations omitted). The burden then shifts to the plaintiff to prove by a preponderance of the evidence that the defendants acted outside the scope of their employment. *Id.; Schneider v. Kissinger,* 310 F.Supp.2d 251, 264 (D.D.C.2004).

**2. The Court Grants the Individual Defendants' Motion to Dismiss and Substitutes the United States in Their Place**

■ The Attorney General's certification that the individual defendants acted within the scope of their employment is given "prima facie effect." *See Kimbro,* 30

F.3d at 1509; Individual Defs.' Mot. to Dismiss, Ex. 1(Attorney General Certification). It is now the plaintiffs' burden to prove by a preponderance of the evidence that the defendants acted outside their scope of employment. *Id.* In an effort to meet their burden, the plaintiffs apply the law of the District of Columbia, where the alleged acts or omissions complained of presumably took place.[5] *See Hoston v. Silbert,* 681 F.2d 876, 878 (D.C.Cir.1982) (noting that the FTCA calls for the application of the law where an act or omission took place); *Smith v. Grimes,* 798 F.Supp. 798, 800 (D.D.C.1992) (stating that " 'the law of the place where the act or omission occurred' governs the scope of employment issue") (citations omitted). Under District of Columbia law, the conduct of a servant is within the scope of employment if:

> (1) it is of the kind he is employed to perform; (2) it occurs substantially within the authorized time and space limits; (3) it is actuated, at least in part, by a purpose to serve the master; and (4) if force is intentionally used by the servant against another, the use of force is not unexpected by the master.

*Haddon,* 68 F.3d at 1423–24 (quoting Restatement (Second) of Agency § 228 (1957)).

■ In the instant matter, the plaintiffs move to strike the Attorney General's certification on the basis that the individual defendants' conduct constituted a violation of *"jus cogens* norms and fundamental human rights" and as such, these acts were not within the scope of their employment. Pls.' Opp'n to Individual Defs.' Mot. to Dismiss at 6–7. They allege that the indi-

---

**5.** The plaintiffs contend, and the defendants do not dispute, that for the claims pursuant to the *respondeat superior* doctrine, the law of the District of Columbia applies, that is, the acts or omissions complained of occurred in the District of Columbia. Pls.' Opp'n to the Individual Defs.' Mot. to Dismiss at 6; Individual Defs.' Mot. to Dismiss Reply at 2 (applying District of Columbia agency law to the scope of employment analysis).

vidual defendants' actions, which the plaintiffs brand as genocide, torture, forced relocation, and cruel, inhuman, and degrading treatment, were not of the type the individual defendants were employed to perform. *Id.* at 8–9. Under D.C. law, however, an employee's conduct is of the kind he is employed to perform only to the extent it is "of 'the same general nature as that authorized' or 'incidental to the conduct authorized.'" *Haddon*, 68 F.3d at 1424 (quoting the Restatement (Second) of Agency § 229 (1957)). For an employee's conduct to be "incidental," it must be foreseeable. *Id.* "Foreseeable" means that the act or omission must be a "direct outgrowth" of the employee's job performance in carrying out his instructions or assignments. *Id.* (citations omitted).

The plaintiffs argue that the individual defendants' actions in removing the Chagossian population out of Chagos were "outrageous" and cannot be considered a direct outgrowth of their job assignment. Pls.' Opp'n to Individual Defs.' Mot. to Dismiss at 8. But in the vicarious liability context, the court's role is not to establish "whether the alleged conduct is deleterious or actionable; rather, [the court is required to] determine *who* may be held liable for that conduct, an employee or his boss." *Schneider*, 310 F.Supp.2d at 265. After all, the purpose behind the doctrine of *respondeat superior* is to "subject an employer to liability for 'whatever is done by the employee in virtue of his employment and in furtherance of its end.'" *Weinberg v. Johnson*, 518 A.2d 985, 988 (D.C.1986) (citations omitted). In other words, an employer may be held liable for his employee's tortious acts, even though the employer did not hire him for that purpose. *Schneider*, 310 F.Supp.2d at 265.

The court concludes that the individual defendants were acting within the scope of their employment when the events alleged by the plaintiffs occurred. From 1967 to 1975, the individual defendants worked in their official capacity for various federal agencies, including the Department of Defense, the State Department's Office of Political and Military Affairs, the State Department's Office of International Security Operations, the Bureau of Political Military Affairs, and the Secretary of the Navy. Individual Defs.' Mot to Dismiss at 3–4. The negotiations with Britain concerning the Chagos archipelago, the relocation of the Chagossian population to Mauritius and Seychelles, and the development and construction of a military base on Diego Garcia were activities undertaken by each of the individual defendants to further the U.S. government's national security interests, not their personal interests. *See Weinberg*, 518 A.2d at 990 (stating that "[t]he tort must be actuated, at least in part, by a purpose to further the master's business and not be unexpected in view of the servant's duties."); Individual Defs.' Mot. to Dismiss at 4; Pls.' Opp'n to Individual Defs.' Mot. to Dismiss at 10–11.

Even though the individual defendants' actions in establishing a base on Diego Garcia were within the scope of their employment, the plaintiffs contend that the force allegedly used by the individual defendants while removing the Chagossians from Chagos was never authorized. Pls.' Opp'n to Individual Defs.' Mot. to Dismiss at 10. As stated above, however, a tortious act is incidental when it is a "direct outgrowth" of the performance of an employee's instructions or job assignment. *Haddon*, 68 F.3d at 1424. The alleged improper misplacement of the plaintiffs by the individual defendants, if true, was incidental to the individual defendants' job in establishing a military base on Diego Garcia. There is no doubt that the relocation of a population of approximately 1,000 peo-

ple would naturally create challenges for the native Chagossians and the governments of Great Britain and the United States. Nevertheless, the actions involved in relocating the Chagossian population cannot be said to have been unexpected or outside the individual defendants' scope of employment because they arose directly out of the United States' efforts to build a secured military facility in the Indian Ocean. Based on these considerations, the court concludes that the individual defendants were acting within the scope of their employment.

■ The court's analysis, however, does not end here. The plaintiffs still contend that the individual defendants can be held liable pursuant to two exceptions under the Westfall Act. Specifically, a grant of immunity under the Westfall Act does not apply when a civil action is "brought [1] for violations of the Constitution of the United States, or . . . [2] for a violation of a statute of the United States under which such action against an individual is otherwise authorized." 28 U.S.C. § 2679(b)(2)(A)-(B). The plaintiffs argue that their claims brought under the ATCA and international law fall within the second exception.

A waiver of immunity is provided by 28 U.S.C. § 2679(b)(2)(B) when federal officials or employees violate "a statute of the United States under which such action against an individual is otherwise authorized." 28 U.S.C. § 2679(b)(2)(B). The plaintiffs argue that they can invoke a waiver of immunity for purposes of 28 U.S.C. § 2679(b)(2)(B) because the individual defendants violated the ATCA by committing torts "in violation of the law of nations[.]" [6] 28 U.S.C. § 1350; Pls.' Opp'n to Individual Defs.' Mot. to Dismiss at 12. They further assert that "[t]he plain meaning of the statute establishes that § 1350 is *both* a 'jurisdictional grant and a private right to sue for tortious violations of international law[.]'" Pls.' Opp'n to Individual Defs.' Mot. to Dismiss at 13 (quoting *Xuncax v. Gramajo*, 886 F.Supp. 162, 179 (D.Mass.1995) (footnote omitted)). The Supreme Court, however, recently held that the ATCA is strictly a jurisdictional statute available to enforce a small number of international norms. *Sosa*, 124 S.Ct. at 2755, 2764. Before adapting the law of nations to private rights, the Court called all federal courts to exercise "great caution" and only allow norms that are "definite" and accepted "among civilized nations" to support a cause of action. *Id.* at 2765 (citations omitted).[7]

This review of *Sosa* shows that § 1350 of the ATCA facilitates the bringing of an action for violations of the law of nations. The plain language of ATCA, however, does not confer rights nor does it impose obligations or duties that, if violated, would trigger the § 2679(b)(2)(B) exception. For the § 2679(b)(2)(B) exception to apply, the ATCA would have to create substantive rights or duties that can be violated for purposes of the Westfall Act. *See Schneider*, 310 F.Supp.2d at 267 (relying on *Alvarez–Machain v. United States*, 266 F.3d

---

6. Pursuant to the Alien Tort Claims Act, 28 U.S.C. § 1350 ("ATCA"), "the district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or treaty of the United States." 28 U.S.C. § 1350.

7. The Supreme Court in *Sosa* provided another reason for barring private causes of action for violations of international law. The Court warned that before recognizing these causes,

the courts should consider "the potential implications for the foreign relations of the United States . . . [and be] wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Sosa*, 124 S.Ct. at 2763. A more thorough discussion of the foreign affairs concerns calling for a bar to judicial review of this case is presented *infra* Part III.B.3.

1045, 1053–54 (9th Cir.2001) for the proposition that "the ATCA itself cannot be violated for purposes of § 2679(b)(2)(B)"). A claim brought pursuant to the ATCA, therefore, is based on a violation of rights conferred under international law, not the ATCA. *Alvarez–Machain,* 266 F.3d at 1053 (citing *Smith,* 499 U.S. at 174, 111 S.Ct. 1180). Accordingly, the court concludes that the plaintiffs fails to satisfy the exception under 28 U.S.C. § 2679(b)(2)(B).

The plaintiffs again attempt to obtain a waiver of immunity under 28 U.S.C. § 2679(b)(2)(B) by arguing that their cause of action "for violations of international law 'arises under' the laws of the United States for purposes of jurisdiction under 28 U.S.C. § 1331." Pls.' Opp'n to Individual Defs.' Mot. to Dismiss at 14. They claim that "federal common law incorporates international law," and thus that their case presents a federal question. Pls.' Opp'n to Individual Defs.' Mot. to Dismiss at 15 (citing *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900) and *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964)). The Westfall Act, however, is explicit in allowing an exception only for "a violation of a statute of the United States [or] a violation of the Constitution of the United States," not federal common law or international law. 28 U.S.C. § 2679(b)(2)(A)-(B); *Schneider,* 310 F.Supp.2d at 267. Moreover, the plaintiffs cannot bring suit for a violation of 28 U.S.C. § 1331 because this statute confers only federal question jurisdiction, not a cause of action for violations of international law. *Schneider,* 310 F.Supp.2d at 267. Accordingly, the court concludes that the plaintiffs fails to satisfy 28 U.S.C. § 2679(b)(2)(B).

In sum, the plaintiffs fail to meet their burden of proving that the individual defendants acted outside the scope of their employment and thus fail to rebut the Attorney General's certification. The plaintiffs also fail to satisfy the statutory exception allowed under 28 U.S.C. § 2679(b)(2)(B) because neither the ATCA nor international law claims brought pursuant to 28 U.S.C. § 1331 confer any rights that can be violated for purposes of the Westfall Act. Therefore, the Attorney General's certification that the individual defendants acted within their scope of employment maintains its prima facie effect. Accordingly, the court grants the individual defendants' motion to dismiss and substitutes the United States in their place.

### 3. A Remedy Under the FTCA is not Available to the Plaintiffs

■ Once the liability of a federal officer or employee for common law torts committed within the scope of their employment is removed, the sole remedy available to the plaintiffs is to pursue an action against the United States under the FTCA. 28 U.S.C. §§ 1346(b), 2679(b)(1); *see e.g., Smith,* 499 U.S. at 163, 111 S.Ct. 1180.

#### a. Legal Standard for Exhaustion of Administrative Remedies Under the FTCA

The FTCA "grants federal district courts jurisdiction over claims arising from certain torts committed by federal employees in the scope of their employment, and waives the government's sovereign immunity from such claims." *Sloan v. Dep't of Housing & Urban Dev.,* 236 F.3d 756, 759 (D.C.Cir.2001) (citing 28 U.S.C. §§ 1346(b) & 2674); *Richards v. United States,* 369 U.S. 1, 6, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962) (stating that the FTCA "was designed to remove the sovereign immunity of the United States from suits in tort"). "The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies." *McNeil v. United States,* 508 U.S. 106, 113,

113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) (upholding the district court's dismissal of an unexhausted FTCA claim for lack of jurisdiction). Under the FTCA, exhaustion occurs once a claimant has presented the appropriate federal agency with a claim describing the alleged injury with particularity and setting forth a "sum certain" of damages, and the agency has (1) denied the claim in writing or (2) failed to provide a final disposition within six months of the claim's filing. 28 U.S.C. § 2675(a).

### b. The Plaintiffs Failed to Exhaust Their Administrative Remedies

In the instant case the plaintiffs alerted the court that this suit "should not be construed as seeking relief under the FTCA" because the plaintiffs had yet to exhaust the administrative remedies that are a prerequisite to bringing suit under the FTCA. 2d Am. Compl. ¶ 5. In response to the United States' motion to dismiss, the plaintiffs made an attempt to retract the above admission and argued that "all administrative remedies are effectively exhausted by Defendant United States' responsive filing." Pls.' Opp'n to Def.'s Mot. to Dismiss at 7. The plaintiffs' attempt to circumvent the requirements set forth under 28 U.S.C. § 2675(a) for the exhaustion of administrative remedies appears clear. However, "[a]llowing claimants generally to bring suit under the FTCA before exhausting their administrative remedies . . . would render the exhaustion requirement meaningless and impose an unnecessary burden on the judicial system." *Schneider*, 310 F.Supp.2d at 270 (quoting *Duplan v. Harper*, 188 F.3d 1195, 1199 (10th Cir. 1999)). The plaintiffs failed to present any evidence that they exhausted their administrative remedies. Rather the plaintiffs first admitted that they had not exhausted the prerequisite process under 28 U.S.C. § 2675, *see* 2d Am. Compl. ¶ 5, then changed their position to a blanket statement that opposition to their claims by the United States "effectively denied any potential administrative claims that arguable lie pursuant to the [FTCA.]" Pls' Opp'n to Defs.' Mot. to Dismiss at 7. The plaintiffs failed to show that they presented their claims to the appropriate federal agency and received a final disposition of the claims by that agency, as required by 28 U.S.C. § 2675. Therefore, the plaintiffs failed to persuade the court that they exhausted their administrative remedies, which in turn precludes this court from entertaining an FTCA suit against the United States.[8] Accordingly, the court concludes that the plaintiffs cannot claim any waiver of sovereign immunity under the FTCA.

### B. The United States' Motion to Dismiss

### 1. Legal Standard for Motions to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1).

Federal courts are courts of limited jurisdiction and the law presumes that "a

---

8. Even if the plaintiffs could exhaust their administrative remedies by the United States' mere filing of a motion to dismiss, they would be precluded from bringing this suit under the headquarters doctrine of the FTCA. *See* 28 U.S.C. 2680(k) (barring suits against the United States for claims arising in a foreign country). The Supreme Court in *Sosa* clarified that "the FTCA's foreign country exception bars all claims based on any injury suffered in a foreign country, regardless of where the tortious act or omission occurred." *Sosa*, 124 S.Ct. at 2754. In this case, the alleged injuries suffered by the plaintiffs occurred in the Chagos islands, a territory of the Great Britain. As a result, adjudication of these claims would require the court to apply British law, which "the foreign country exception was meant to avoid." *Id.* at 2753; *see infra* note 9 (discussing the judicial decision by the British Queen's Bench regarding the plaintiffs claims). Due to the Supreme Court's clarification of the headquarters doctrine, the court concludes that the plaintiffs' claims would be barred because their injuries occurred on foreign soil.

cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89, 58 S.Ct. 586, 82 L.Ed. 845 (1938). Because "subject-matter jurisdiction is an 'Article III as well as a statutory requirement[,] no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C.Cir.2003) (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982)). On a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject-matter jurisdiction. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir.1999); *Rasul v. Bush*, 215 F.Supp.2d 55, 61 (D.D.C.2002) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 182–83, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)). The court may dismiss a complaint for lack of subject matter jurisdiction only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Empagran S.A. v. F. Hoffman–LaRoche, Ltd.*, 315 F.3d 338, 343 (D.C.Cir.2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Because subject-matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim. *Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C.Cir.2003); *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F.Supp.2d 9, 13 (D.D.C.2001). Moreover, the court is not limited to the allegations contained in the complaint. *Hohri v. United States*, 782 F.2d 227, 241 (D.C.Cir.1986), *vacated on other grounds*, 482 U.S. 64, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987). Instead, to determine whether it has jurisdiction over the claim, the court may consider materials outside the pleadings. *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C.Cir.1992).

### 2. Legal Standard for the Political Question Doctrine

■ The Supreme Court has explained that the political question doctrine bars judicial review when there are "controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986); *Nixon v. United States*, 506 U.S. 224, 228, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993) (noting that the political question doctrine excludes from judicial review controversies that the Constitution commits for resolution to the political branches) (citation omitted). The rationality behind this doctrine is that the "courts are fundamentally under equipped to formulate national policy or develop standards for matters not legal in nature." *Japan Whaling Ass'n*, 478 U.S. at 230, 106 S.Ct. 2860 (quoting *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1379 (D.C.Cir.1981)). To determine whether a case involves a political question, the court must examine six criteria:

■ a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking in-

dependent resolution without expressing lack of respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). If any of these formulations is met, then the case is nonjusticiable. *Id.; Industria Panificadora, S.A. v. United States,* 763 F.Supp. 1154, 1159 (D.D.C.1991), *aff'd,* 957 F.2d 886 (D.C.Cir.1992).

### 3. The Court Grants the United States' Motion to Dismiss Because the Instant Case Raises Nonjusticiable Political Questions

### a. The Conduct of Military Operations is Committed to a Coordinate Political Department

■ To determine if a case raises a nonjusticiable political question, the court must evaluate whether the text of the Constitution commits the disputed matter to the political branches. *Baker,* 369 U.S. at 217, 82 S.Ct. 691. When cases challenge our nation's foreign policy, the general rule is that "[t]he conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political'—departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Oetjen v. Central Leather Co.,* 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918) (citations omitted). Yet, as the Supreme Court states, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker,* 369 U.S. at 211, 82 S.Ct. 691. Foreign policy decisions concerning the conduct of our military opera-

tions, however, do not merely touch the realm of foreign affairs but rather involve serious political questions not within the province of the judicial branch. *See Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948) (noting that "the very nature of executive decisions as to foreign policy is political, not judicial[;] ... [t]hey are decisions of a kind for which the judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry") (citations omitted). The Supreme Court considers the conduct of military operations to be "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy,* 342 U.S. 580, 589, 72 S.Ct. 512, 96 L.Ed. 586 (1952) (citations omitted). In harmony with established precedent, the D.C. Circuit has explained that

> [t]he fundamental division of authority and power established by the Constitution precludes judges from overseeing the conduct of foreign policy or the use and disposition of military power [because such] matters are plainly the exclusive province of Congress and the Executive.

*Luftig v. McNamara,* 373 F.2d 664, 665–66 (D.C.Cir.1967); *see also Mahorner v. Bush,* 2003 WL 349713 (D.C.Cir.2003) (affirming the district court's denial of a petitioner's motion to enjoin President Bush from using military force against Iraq because the plaintiff's claims presented nonjusticiable political questions).

Against this backdrop, the court now examines the plaintiffs' argument. The plaintiffs contend that "they do not seek to adjudicate the lawfulness or political wisdom of the United States' decision to negotiate with the United Kingdom, nor to

establish a military base on Diego Garcia." Pls.' Opp'n to Def.'s Mot. to Dismiss at 10. Rather, they ask the court to assess "the legality of [the] Defendant's implementation of that policy." *Id.* The plaintiffs rely heavily on *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1511 (D.C.Cir.1984) (en banc), *vacated on other grounds*, 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985). Ramirez, a U.S. citizen and owner of a large cattle ranch in Honduras, challenged the occupation and destruction of his ranch by the United States military. *Id.* at 1506–08. Because Ramirez was a U.S. citizen and was afforded the protections of the United States Constitution, namely the 5th Amendment, the court found that he had "a judicially cognizable interest in the affected property sufficient to enable [him] to sue for an unconstitutional deprivation of the use and enjoyment of that private property." *Id.* at 1516. The D.C. Circuit also concluded that Ramirez presented a justiciable claim because he did not object to the U.S. military presence in Honduras but rather sought "adjudication of the narrow issue whether the United States defendants may run military exercises throughout the plaintiff's private pastures when [his] land has not been fully expropriated." *Id.* at 1512.

*Ramirez* is distinguishable from the present case. First, in *Ramirez*, the court found that the United States and Honduran governments did not begin expropriating the plaintiff's land until after the suit commenced. *Id.* at 1509. In this case, however, the British and the United States governments entered into a diplomatic agreement before the United States could occupy the Chagos islands. *See* Availability of Certain Indian Ocean Islands for the Defense Purposes (BIOT Agreement), Dec. 30, 1966, U.S.-U.K., 18 U.S.T. 28. The removal of the Chagossian population from Chagos was also effected under British law and pursuant to the BIOT Agreement. *See* Def.'s Mot. to Dismiss, Ex. A. (The Immigration Ordinance 1971 of the British Indian Ocean Territory). And second, while the plaintiff in *Ramirez* was a U.S. citizen and was afforded the protection of the U.S. Constitution, the alien plaintiffs in this case do not enjoy those constitutional rights. *Johnson v. Eisentrager*, 339 U.S. 763, 784–85, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) (holding that Fifth Amendment protections do not extend to aliens outside the territory of the United States).

Because this particular matter involves the entry by the United States and Britain into an international agreement and the execution of this agreement pursuant to Britain's 1971 Immigration Ordinance, the political question doctrine precludes review of this case.[9] *See Antolok v. United States*, 873 F.2d 369, 381 (D.C.Cir.1989) (noting that treaty negotiations are one area of foreign relations excluded from judicial review). Although the plaintiffs argue that they only challenge the implementation of the BIOT agreement, the plaintiffs are really asking the court to assess the reasonableness of the Executive Branch's decisions to (1) depopulate the Chagos islands and (2) ensure that the military base on Diego Garcia remains off-limits to non-authorized civilians. The

---

9. The British judiciary has already considered the legality of the 1971 Immigration Ordinance in the case *Regina (Bancoult) v. Secretary of State for Foreign and Commonwealth Affairs and Another*, Queens Bench Division, 2001 Q.B. 1067, 2000 WL 1629583 at *1104–06 (recognizing that the removal of the Cha- gossian population pursuant to the 1971 Immigration Ordinance, although conducted in a manner which was not conducive to the "peace, order and good government" of the British Indian Ocean Territory, was dictated by pressing military considerations).

court concludes that the Executive and Legislative Branches' conduct of military operations and foreign policy complained of in this case, which raise national security concerns, are "plainly the exclusive province of Congress and the Executive[,]" and thus are non-justiciable political questions. *Luftig*, 373 F.2d at 665–66.

**b. The Resolution of This Suit Demands That the Court Move Beyond Areas of Judicial Expertise**

The second of the six criteria set forth by the Supreme Court in *Baker* requires the court to examine whether there are judicially discoverable and manageable standards for resolving the case at hand. *Baker*, 369 U.S. at 217, 82 S.Ct. 691. If resolution of the suit demands the court to move beyond areas of judicial expertise, then the case is nonjusticiable. *Cf. Powell v. McCormack*, 395 U.S. 486, 548–49, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) (holding a petitioner's claim justiciable because interpretation of the Constitution "falls within the traditional role accorded [to the] courts"). In the instant matter, the plaintiffs argue that their lawsuit involves torts, which require "interpretation of the federal common law and customary international law." Pls.' Opp'n to Def.'s Mot. to Dismiss at 13. While tort liability is a matter within this court's expertise, it is the political nature of this case that bars judicial review. *See Industria Panificadora, S.A. v. United States*, 763 F.Supp. 1154, 1161 (D.D.C.1991) (holding that there were no judicially manageable standards to examine whether the United States was negligent in failing to assign sufficient police power to patrol the city of Panama after the ousting of General Manuel Noriega); *Schneider*, 310 F.Supp.2d at 261–62 (stating that there existed no judicially man-

ageable standards to evaluate Dr. Henry Kissinger's actions in support of the 1973 Chilean coup and the kidnaping of a Chilean general). The allegations made in the complaint would require the court to assess whether it was proper for Britain and the United States to enter an agreement for the construction of a military based in Chagos thirty years ago. This would also demand the court to second-guess the initial and continuing decisions of the executive and legislative branches to exclude civilians from Diego Garcia. Neither our federal law nor customary international law provide standards by which the court can measure and balance the foreign policy considerations at play in this case, such as the containment of the Soviet Union in the Indian Ocean thirty years ago and today, the support of military operations in the Middle East.[10] The court concludes that it is ill-equipped to review the conduct of the military operations challenged in this case because they implicate foreign policy and national security concerns, such as the current war on terror, which are best resolved by the political branches.

**c. Judicial Resolution Would Require an Initial Policy Determination of a Kind Clearly for Nonjudicial Discretion**

As discussed above, the Constitution delegates issues of foreign policy to the political departments of the government. *See Oetjen*, 246 U.S. at 302, 38 S.Ct. 309. An examination of the measures used to provide for national security would require the court to make "a policy determination of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217, 82 S.Ct. 691. The plaintiffs claim that they do not seek "judicial monitoring of foreign policy in the Indian Ocean" nor the balancing of our

---

**10.** The United States contends that the military base on Diego Garcia supported and continues to support military endeavors, such as

Operation Dessert Shield/Dessert Storm and Operation Enduring Freedom. Def.'s Mot. to Dismiss at 1.

nation's security interests with the plaintiffs' interest in returning to the islands. Pls.' Opp'n to Def.'s Mot. to Dismiss at 14. Although the plaintiffs try not to challenge the Executive's decision to maintain a secure base on Diego Garcia, they are asking the court to substitute its judgment for that of the political branches and determine the national defense needs of the U.S. military in the Indian Ocean. Taking this action would force the court to step into the shoes of the political branches and issue a policy determination of a kind that does not fall within its judicial province. *Baker*, 369 U.S. at 217, 82 S.Ct. 691.

### d. Other Prudential Considerations Counsel Against Judicial Intervention

Not only can the court not entertain this case pursuant to the prior three *Baker* factors, but there are further prudential considerations that counsel against judicial intervention. These considerations include: (1) expressing a lack of respect for the political branches; (2) adhering to a political decision already made; and (3) the potential for embarrassment from multifarious pronouncements by various departments on one question. *See Baker*, 369 U.S. at 217, 82 S.Ct. 691. The court now turns to these prudential considerations.

### I. Lack of Respect

Intrusion by the judiciary into a matter that Congress and the Executive branch discussed and debated thirty years ago would force the court to show "a lack of respect due coordinate branches of government." *Baker*, 369 U.S. at 217, 82 S.Ct. 691. The plaintiffs, however, contend that "Congress never debated the circumstances surrounding the manner in which [the] plaintiffs were [removed] from their homes" and therefore, the court's intervention would not cause it to express a lack of respect for the political branches. Pls.' Opp'n to Def.'s Mot. to Dismiss at 17.

Even if the court could examine the plaintiffs' claims, the removal of the Chagossian population from Chagos was debated publicly by Congress and members of the Executive branch in 1975. *See* The 1975 Congressional Debate Over Diego Garcia at 37–62. The discussions centered on the mistreatment of the Chagossians by Great Britain and the United States, and certain allegations that the relocation of the Chagossian population had been accomplished through secret arrangements with Great Britain. *Id.* at 40–49. Despite these disclosures, Congress decided to provide funding for the construction of a military base on Diego Garcia. As a result, it is impossible for the court to resolve this case without condemning the Executive for mistreating the Chagossians while they were being relocated to Mauritius and Seychelles. At the same time, the court cannot entertain the plaintiffs' claims without condemning Congress for financing the construction of a base on Diego Garcia and failing to demand that the Executive ensure that Britain provide adequate compensation for the resettlement of its citizens. Accordingly, this case presents a nonjusticiable political question because it is impossible for the court to undertake an "independent resolution without expressing a lack of respect due coordinate branches of government." *Baker*, 369 U.S. at 217, 82 S.Ct. 691.

### ii. Adherence to a Political Decision Already Made

As discussed above, the political branches of our government decided thirty years ago to build and expand their military operations on Diego Garcia, despite its impact on the Chagossian population. The plaintiffs, however, continue to allege that the "specific circumstances" surrounding their claims were not fully aired during the 1975 hearings and therefore, there was no political decision that will require this

court's adherence. Pls.' Opp'n to Def.'s Mot. to Dismiss at 16. The court disagrees. An examination of the 1975 Congressional record, amounting to 123 pages, reveals that members of Congress and the Executive branch addressed most of the claims that the plaintiffs bring before the court today. *See* The 1975 Congressional Debate Over Diego Garcia at 45–49 (listing the testimony and a report issued by former Senator John Culver of the House Committee on International Relations, which addressed the manner in which the Chagossians were treated by the United States and Great Britain, as well as their living conditions in Mauritius and Seychelles). The Congressional record also explains that the threat of Soviet expansion in the Middle East and Indian Ocean forced the Executive branch to enter into an agreement with Britain to build a military base on Diego Garcia. *Id.* at v, 1–36. Taking into account these national security concerns, Congress approved funding for the construction of the base. *Id.* at 62–63 (indicating that Congress appropriated $14 million dollars during fiscal year 1975 for the continued construction of the base). Contrary to the plaintiffs' averments, the record just examined demonstrates that the political branches explicitly chose, after Congress gave its approval, to build a military base on Diego Garcia. Accordingly, the court concludes that there is "unusual need for unquestioning adherence to a political decision already made." *Baker*, 369 U.S. at 217, 82 S.Ct. 691.

### iii. Potential for Embarrassment from Multifarious Pronouncements by Various Departments

A third prudential consideration is that there is a potential for embarrassment if the judicial and the political branches make conflicting pronouncements on questions relating to foreign affairs. *Baker*, 369 U.S. at 217, 82 S.Ct. 691. The circumstances surrounding the establishment of a military base on Diego Garcia were the subject of sensitive debates among members of Congress and the Executive branch. Ultimately, the political branches made the decision to continue constructing the base and maintain a presence in the Indian Ocean, despite the situation of the Chagossian population. By adding its opinion to this medley of concerns, the court will disturb the government's "single voice" in the realm of foreign military policy and subject the judiciary and the political departments to potential embarrassment. The court concludes that this case raises a nonjusticiable political question due to "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Id.* at 217, 82 S.Ct. 691.

Accordingly, after analyzing the *Baker* factors and for all these reasons, the court concludes that this case fits squarely within the nonjusticiable confines of the political question doctrine. Therefore, the court grants the defendant United States' motion to dismiss.

### C. The Court Denies the Plaintiffs' Second Motion for a Preliminary Injunction

The court's order granting the individual defendants' and the United States' motions to dismiss renders the plaintiffs' second motion for a preliminary injunction moot. Accordingly, the court denies the plaintiffs' second motion for a preliminary injunction.

### IV. CONCLUSION

For the foregoing reasons, the court grants the individual defendants' motion to dismiss and the United States' motion to dismiss. The court also denies the plaintiffs' second motion for a preliminary injunction as moot. An order directing the parties in a manner consistent with this Memorandum Opinion is separately and

contemporaneously issued this 21st day of December 2004.